**UNITED STATES of America**

v.

**Fawaz YUNIS.**

**Crim. No. 87–0377.**

United States District Court, District of Columbia.

Feb. 23, 1988.

J. Ramsey Johnson, Karen A. Morrissette, Jennifer Gold, Asst. U.S. Attys., Washington, D.C., for plaintiff.

Francis D. Carter, Turner and Carter, Washington, D.C., for defendant.

## PRETRIAL MEMORANDUM ORDER NO. 5

(Denying Motion to Dismiss Because of Illegal Arrest; Granting Motion to Suppress Statements)

BARRINGTON D. PARKER, District Judge.

This Memorandum Order addresses two of the remaining substantive pretrial motions filed on behalf of the defendant: (1) Motion to Dismiss the Indictment Based on the Illegal Arrest of the Defendant, and (2) Motion to Suppress Statements. Both motions concern fundamental legal principles that law enforcement officers must act in accordance with long recognized and established restraints embodied in the fourth, fifth and sixth amendments no matter who is the subject of arrest or where the arrest occurs. These constitutional principles should not be cast aside nor minimized merely by invoking "national security" or "the fight against terrorism".

Defendant, Fawaz Yunis, a citizen of Lebanon, was lured out of his homeland, arrested in international waters off the coast of Cyprus, and forcibly brought to the United States to face charges of hostage taking and aircraft piracy. His counsel argues that the arresting officers failed to respect the defendant's constitutional rights when he was arrested and that they unlawfully secured inculpatory statements from him while he was being brought back to the United States. He has moved to dismiss the indictment on grounds that the circumstances surrounding the arrest were outrageous and violated defendant's due process rights. Counsel has also moved to suppress his client's inculpatory statements and written confession claiming that his rights were not voluntarily or knowingly waived.

For the reasons discussed in part II below, the Court denies the motion to dismiss the indictment on grounds that the defendant was the subject of an illegal arrest. In part III, the Court states the grounds for suppressing the written confession secured from Fawaz Yunis.

The discussion of the two motions rests on the actual events which occurred during the course of and following the defendant's arrest. In part I, the Court states its findings, giving the background facts and circumstances surrounding the arrest. It then turns to and considers the motion to dismiss the indictment and the motion to suppress statements.

## I.

## BACKGROUND FACTS

Operation "Goldenrod", the chosen name for the government's plan to abduct de-

fendant Yunis, was a carefully devised and well executed effort to arrest and bring to trial the ringleader of the small band of men who hijacked and later blew up a Royal Jordanian aircraft at the Beirut International Airport.[1] Immediately following the hijacking, the United States Government sought to identify, locate and capture the responsible persons. After months of investigation, its efforts were focused on the defendant, Fawaz Yunis, identified as the ringleader. In this connection, the government secured and relied in large measure on the services of Jamal Hamdan, a one-time friend of Yunis who became a government informant.

With the help of Hamdan, the government developed an elaborate scheme to lure Yunis from Lebanon to a location in international waters of the Mediterranean sea off the coast of Cyprus. The bait was the promise of a lucrative narcotics deal.

## A.

The full operation, including the defendant's arrest and return to the United States for trial, was conceived well in advance of its execution. In early 1987, Oliver Revell, Executive Assistant Director of the Federal Bureau of Investigation ("FBI"), together with representatives from other United States' agencies[2] began the task of devising a plan to abduct the defendant. While other agencies were involved, the record and testimony clearly showed that the FBI took the leadership role in formulating the plans. Trans. of test., Oliver Revell, Jan. 28, 1988 at 167, 168. As the actual date of execution grew nearer, the planning group met frequently to "iron out last-minute details." *Id.* at 168. Approximately three weeks before the operation actually commenced, the government settled on the logistical plans necessary for transporting the defendant from the point of his arrest in the Mediterranean Sea back to the United States. *Id.* at 175. The plan included arresting the defendant on a motor yacht in international waters off the coast of Cyprus and transferring him to a "recovery ship", the U.S.S. Butte. The Butte, a naval munitions ship assigned to the United States Sixth Fleet, was instructed to steam across the Mediterranean to a prearranged rendezvous point with the aircraft carrier, the U.S.S. Saratoga.[3] *Id.* at 184. According to Joseph Davis, the Butte's captain, the government slated four days for this leg of the voyage. Trans. of test., Jan. 25, 1988 at 58, 89. From the Saratoga, the defendant was to be first tranquilized, then placed in a "Stokes" litter[4] and flown in a twin engine S3 aircraft to Andrews Air Force Base, Maryland.[5] All in all, the entire scenario from arrest to arrival in the United States was scheduled to be completed in five days.

## B.

Operation "Goldenrod" was carried out exactly as planned. On the morning of September 13, 1987, Hamdan and Yunis boarded a small motor boat off the coast of Cyprus, were carried to a prearranged point into international waters, where they then rendezvoused with the motor yacht. The motor boat then returned to shore.

---

1. The events of the hijacking are set out in Pretrial Memorandum Order No. 4, pp. 3–5.

2. During the motions hearing, government testimony identified the other agencies involved to be the Department of the Defense, Department of State, Department of Justice, and the Federal Bureau of Investigation. Trans. of Oliver Revell, Jan. 28, 1988, at 168.

   The Court has reviewed *in camera, ex parte* documents which show that other federal agencies were involved and has also determined that for reasons of national security the agencies need not be divulged. Indeed, the documents would not in any way favor or prejudice the defendant's case.

3. At the time the Sixth Fleet was scheduled to begin maneuvers in and around the Mediterranean Sea.

4. A Stokes litter is commonly used by the Navy to carry injured personnel. Occupants are strapped into the litter and immobilized in a prone position. See Trans. of test., S.A. David Johnson, Jan. 19, 1988 at 55–57.

5. The S3 is a fixed wing aircraft designed for anti-submarine warfare and surface surveillance. It seats only two passengers in addition to the pilot and co-pilot.

The record is clear that the motor yacht, named the "Skunk Kilo" was anchored in international waters. Captain Davis testified that his navigation officers used radar and tracking equipment to monitor the location of the motor yacht and maintained continuous radio contact with the agents on board the yacht to ensure that it did not stray beyond international waters. *Id.* at 49–52. The Butte's Quartermaster, John Espinosa, also prepared a chart, GX 12, which clearly showed that the yacht was anchored in international waters south of Cyprus. Trans. of test., Jan. 25, 1988 at 132–133.

Immediately upon boarding the yacht, defendant was greeted, given a routine pat down [6] and then offered a beer by one of the FBI agents. S.A. George Gast, who assumed the role of one of the narcotic contacts, escorted Yunis to the stern of the boat where he and Yunis joined S.A. Donald Glasser. At a prearranged signal—a slight nod—the two agents, who were then positioned alongside Yunis, engaged in a *"take down."* Together, they grasped the defendant's arms, "kick[ed] his feet out from underneath him, and [took] him down to the deck and put handcuffs on him." Trans. of test., Gast and Glasser, Jan. 29, 1988, at 33–35 and 63 respectively. After reviewing all of the motion's hearing testimony, the Court finds that the agents' "take down" caused fractures to the defendant's wrists, *infra*, p. 922. Defendant was then carried to the front of the ship where he was strip searched, placed in a harness, re-handcuffed and shackled with metal leg irons. At this point, the defendant complained that his legs and wrists were throbbing with pain; and the agents responded by loosening the cuffs. Trans of test., Dimitry Droujinsky, Jan. 26, 1988, at 29, 104.

The method of arrest had been prearranged and rehearsed several times by the agents to ensure a smooth execution.

They developed a specific plan based on prior information that defendant was approximately 6'2", over 205 pounds, "a good athlete, a good swimmer and [with the] possibility of a struggle taking place." Trans. of Gast, at 43. As it turned out, the defendant was much smaller in stature, only 5'9" and approximately 175 pounds.[7] Yunis never made an aggressive gesture toward the agents. Indeed, Agent Gast testified that he was "very compliant." *Id.* at 64.

After defendant was handcuffed, S.A. Droujinsky, who was quite fluent in Arabic, advised Yunis that he was being arrested by United States authorities for his involvement in the 1985 hijacking of the Royal Jordanian aircraft flight 402. While he told defendant that he was under arrest for the hijacking incident, he never advised him of his rights at that time.

Agent Droujinsky played a key role in Operation "Goldenrod." He served as the interpreter for the four days that Yunis was confined to the Butte. Because the defendant had very little if any ability to understand or speak the English language, Droujinsky's services were most crucial, serving as the principal means of communicating with the defendant.

Immediately following the arrest, the yacht resumed power and slogged for over an hour through extremely rough and choppy seas with 4' to 5' waves, to a prearranged rendezvous point with the Butte. Upon reaching that ship, the defendant and the agents then boarded a small launch vessel which was to be electronically hoisted on board the Butte. Trans of test., David Johnson, Jan. 19, 1988 at 47. However, due to mechanical problems with the winching equipment, naval personnel had to manually hand crank the equipment to allow the party to go aboard. Due to the mechanical difficulty, Yunis and the others were left "swinging and swaying from side to side with the rock and roll of the ship."

---

**6.** Yunis had been advised that the narcotic's dealers would search him for weapons as soon as he boarded the ship. Fully expecting the patdown, he was not suspicious of any "danger". Trans. of test., Donald Glasser, Jan. 29, 1988, at 60.

**7.** In contrast, Gast was 5'2" and 205 pounds. Trans. of Gast at 43–44. Glasser was 6'2" and 220 pounds. Trans. of Glasser at 57.

*Id.* at 88. This movement exacerbated a nauseous condition which defendant had developed. Indeed, he suffered from dry heaves at least twice while the vessel was being lifted alongside the Butte. *Id.* at 47–48; Trans. of test., Thomas Hansen, Jan. 28, 1988, at 46.

C.

Once aboard the Butte, Yunis was escorted to his 8' by 10' "state room", a room normally used to store mail. It had no windows nor a functioning ventilation system. Dr. Clarence Braddock, a naval medical internist aboard the ship solely for Operation "Goldenrod," described the room as "uncomfortably warm." Trans. of test., Jan. 20, 1988 at 35. He proceeded with a medical examination which consisted principally of a routine physical, several blood tests and an urinalysis. He testified that his examination lasted between 20 to 30 minutes. *Id.* at 36. Yunis never volunteered any information; he only spoke in response to specific questions put to him by the doctor. *Id.* at 76.[8] At that time, Dr. Braddock had not been informed that defendant had complained about pain in his wrists and therefore did not respond or even notice when the defendant winced and attempted to withdraw his arms during the physical examination. *Id.* at 63; Trans. of Johnson, at 91. Trans. of Hansen, Jan. 28, 1988, at 51. The agents had advised Doctor Braddock of Yunis' nausea, and therefore, he inquired whether defendant was still feeling nauseous. Trans. of Braddock at 28. Based on defendant's continued complaints, Dr. Braddock concluded that he suffered from seasickness. He prescribed rest to relieve the seasickness and clear liquids to prevent dehydration. *Id.* at 98.

Over the course of the next two days, Dr. Braddock periodically checked on the defendant's physical state and medical condition. On the third day, after being informed that the defendant was constantly complaining of pain in his wrists, he called upon Dr. Rufus Gore, a naval orthopedic surgeon who was also a part of the special medical team, to examine defendant's wrists. His treatment of defendant's wrists did not differ from Dr. Braddock, and consisted of applying ice to relieve the wrist pains and recommending rest and clear liquids to alleviate motion sickness.

Immediately following Dr. Braddock's initial examination and just hours after the arrest, agent Hansen with Droujinsky, acting as interpreter, began the first of nine interviews with the defendant. The first part of their initial interview was spent explaining to Yunis that he had all the rights of a United States citizen. The agents utilized a standard "advice of rights" form, (FD 395). According to Hansen, this prerequisite was completed in approximately nine minutes. Trans. of Hansen, Jan. 27, 1988, at 107, 115–116. At one point, Droujinsky handed Yunis a copy of the rights form translated in Arabic[9] and instructed the defendant to read the form himself. Droujinsky then read the form to defendant, line by line, and asked him whether he understood the information and was willing to sign the card. Trans. of Droujinsky at 43. Defendant answered in the affirmative and signed the form. This proved to be the *first and only time* during the days of interrogation that Yunis was advised of his rights. Trans. of Hansen, Jan. 28, 1988 at 79–80; Trans. of Droujinsky at 139.

Again, without giving defendant any rest, the agents continued for 40 minutes to interview and question the defendant about his involvement in the hijacking of the Jordanian aircraft. A total of nine interviews lasting anywhere from 30 minutes to over two hours were undertaken by the agents over the course of the four days at sea. During these sessions they elicited statements concerning his involvement in the hijacking of the Jordanian aircraft. Agent Hansen took notes throughout and

---

8. Dr. Braddock did not speak Arabic and communicated with the defendant through agent Droujinsky.

9. Several mistakes and omissions were made in the translation of the rights card which made certain phrases confusing and unintelligible. Trans. of Droujinski at 123–129. *See* discussion *infra* p. 924.

at the conclusion of the final interview, completed around 10:30 p.m. of September 16, 1987, presented defendant with a written summary of his statements for his approval and signature. Trans. of Hansen, Jan. 27, 1988, at 158.[10] The defendant initially inquired why he should sign the document. Agent Hansen explained that the signed statement would establish a record of his testimony that could be used as evidence in Court. Trans. of Hansen, Jan. 28, 1988, at 82. After making a single extremely minor change, Yunis signed the statement.

In the early morning of the fifth day at sea, the Butte rendezvoused as scheduled with the Saratoga. At this point, Yunis was prepared for the long flight back to the United States. He was sedated, placed in a Stokes litter and carried by helicopter from the Butte to the aircraft carrier. He was then strapped into the S3. Agents Johnson and John Schrum accompanied and kept guard over the defendant during the flight across the Atlantic. Within the record time of thirteen hours, the aircraft landed at Andrews Air Force Base. Shortly thereafter, the defendant was arraigned in this courthouse before United States Magistrate Jean Dwyer.

Upon arrival in Washington, D.C., Yunis was afforded better medical attention and care to his wrists than he received on the Butte. For the first time, the injuries to his wrists were correctly diagnosed and appropriately treated. *See infra* p. 922 n. 19.

## II.

## MOTION TO DISMISS INDICTMENT BASED ON THE ILLEGAL ARREST

Defendant's counsel has moved to dismiss the entire multi-count indictment on two grounds: first, the government's actions contravened its extradition treaty obligations with Lebanon and Cyprus, and second, the government used excessive and outrageous force when arresting defendant in violation of his fifth amendment rights to due process. Both grounds present threshold questions of standing and jurisdiction: whether Yunis can assert violations of an extradition treaty absent objections or protests by either Lebanon or Cyprus, and whether the defendant, a nonresident alien, can invoke the protective cloak of our Constitution for actions committed beyond the territorial borders of the United States.

For the reasons set forth below, the Court concludes that individuals, alone, are not empowered to enforce extradition treaties. Therefore, it need not reach the issue whether the United States breached its treaty obligations. As to the fifth amendment claims, the Court determines that the Constitution applies abroad to aliens but that the government's actions did not rise to the level of "outrageousness" that "shocks the conscience" and warrants dismissal of the indictment.

### A.

### *Violation of Extradition Treaties*

██ Yunis' counsel argues that the government developed a clever and elaborate scheme to lure defendant out of Lebanon and Cyprus and then arrest him in international waters. This plan, he argues, was established to deliberately circumvent our extradition treaty obligations with Lebanon and Cyprus. He contends further, that the government was well aware that Yunis resided in Beirut, and, therefore, was obligated at the outset to initiate an extradition request to Lebanon. At the very minimum, he suggests that the government should have made such a request to Cyprus, where Yunis was located on September 11, 1987, the date the arrest warrant was issued by the United States Magistrate. Finally, he argues that the remedy for the government's failure to adhere to its treaty obligations is dismissal of the indictment. In response, the government claims that it had no obligation to make an extradition request to either country be-

---

**10.** Agent Hansen prepared the written statement in English and Agent Droujinsky translated it to Arabic. The defendant was given the translated version to read. Trans. of Hansen, Jan. 27, 1988, at 160.

cause the defendant was arrested in international waters.[11] Further, it argues that only sovereign nations can protest violations of an extradition treaty. Since neither Lebanon nor Cyprus have objected to the abduction, Yunis' protest must fail.

Accepted principles of international law recognize that only sovereign nations have the authority to complain about violations of extradition treaties. Individuals are not empowered to assert violations, absent objections by the offended states. Leading treatises on extradition law explain the rationale behind this bright line rule: "Extradition is regarded as an institutional practice between and for the benefit of states with little or no regard for the rights of the individuals who are the object of its outcome." M. Bassiouini, International Extradition in United States Law and Practice, ch. 10 at 629 (1986 ed.) Several federal courts have likewise adhered to this rule: *United States v. Cordero*, 668 F.2d 32, 37 (1st Cir.1981). "[E]xtradition treaties are made for the benefit of the governments concerned ... And, under international law, it is the contracting foreign government, not the defendant, that would have the right to complain about a violation." (Panamanian defendants convicted of distributing cocaine lack standing to assert violation of extradition treaty, absent objections from Panamanian authorities.); *Unit-*

ed States v. Valot, 625 F.2d 308 (9th Cir. 1980) (defendant abducted in Thailand to stand trial in Hawaii; failure to comply with extradition treaty did not bar prosecution); *United States ex rel Lujan v. Gengler*, 510 F.2d 62, 67–78 (2nd Cir.1975) *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975) (Bolivian citizen abducted by United States officials lack standing to assert violation of extradition treaty absent protests by offended states).

In this criminal proceeding, there is no evidence that Lebanon or Cyprus objected or protested to the circumstances under which Yunis was arrested. Absent such formal protests, defendant is precluded from raising his objections.[12]

### B.

*Application of the Constitution to Foreign Aliens*

■ Before the Court can determine whether the government's actions were so outrageous as to "shock the conscience" and violate defendant's due process rights, it must resolve the threshold inquiry: whether constitutional restraints apply to governmental activity overseas. The Constitution is silent regarding its application overseas and the Supreme Court has never definitively resolved whether aliens are protected by the Constitution.[13]

11. Extradition treaties are designed to protect the territorial sovereignty of nation states and promote global cooperation. The government contends that such sovereignty is threatened only when a foreign power *enters* another country for purposes of abducting one of its residents. Since the United States never entered or invaded the sovereign territory of Lebanon or Cyprus when arresting the defendant, there was no reason to make an extradition request.

12. Because defendant lacks standing to assert violations of the alleged extradition treaties, the Court need not decide the two remaining issues: whether the United States has current extradition treaties with Lebanon or Cyprus and whether these treaties were violated if the United States never physically entered the other nation's territory.

13. The most relevant Supreme Court decisions concerning the application of rights to overseas aliens are *Johnson v. Eisentrager*, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) and *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148

(1957). In *Eisentrager*, American military authorities were involved in the arrest of criminals in China and their conviction and incarceration in Germany after World War II. Later, writs of habeas corpus were sought in American courts. In rejecting their application for relief, the Supreme Court wrote: "the Constitution does not confer a right of personal security or an immunity from military trial and punishment upon an alien enemy engaged in the hostile service of a government at war with the United States." *Id.* 339 U.S. at 785, 70 S.Ct. at 947. Some courts have interpreted *Eisentrager* broadly to prohibit any application of the Constitution overseas. Others have read the case more narrowly as denying constitutional rights to enemy aliens in occupied territories during a declared war.

Several years later, the Court ruled in a plurality opinion that citizens overseas enjoyed the full constitutional protections from acts of their government. *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) involved two women stationed with their husbands at overseas military bases. Each killed her husband and

Although the Supreme Court has never explicitly addressed whether the Constitution applies to aliens overseas, it has consistently reaffirmed the principle that our government is one of enumerated powers without authority to act beyond the limitations of the Constitution. This fundamental principle was heralded more than a century ago in *Ex parte Milligan*, 71 U.S. (4 Wall) 2, 18 L.Ed. 281 (1886). "The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of [persons], at all times, and under all circumstances." In other cases, the Supreme Court has held that the Constitution regulates and restricts the conduct of the federal government "whenever and wherever the sovereign power of that government is exerted." *Balzac v. Porto Rico*, 258 U.S. 298, 312–13, 42 S.Ct. 343, 348, 66 L.Ed. 627 (1922). Indeed, even in *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936), a case routinely cited for the proposition that executive powers are strongest in the realm of foreign affairs, the Court's opinion reads, "every .... government power, must be exercised in subordination to the applicable provisions of the Constitution." 299 U.S. at 320, 57 S.Ct. at 221. Granting the United States unfettered powers to secure the arrest of a nonresident alien overseas runs directly contrary to the Court's theory of constituted powers. As Justice Louis Brandeis eloquently stated in *Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) "To declare that in the administration of the criminal law the ends justify the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution."

The majority of circuits have applied the Constitution extraterriorially and required the United States government to conform to constitutional proscriptions when acting overseas.[14] Similarly, The Restatement (revised) of Foreign Relations Law supports extending constitutional rights to aliens in certain cases.[15] Although our Court of Appeals has never explicitly embraced this trend,[16] this Court finds the

---

was tried without a jury. The Court overturned the convictions holding that "the United States is entirely a creature of the Constitution. Its powers and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution." *Id* at 5–6, 77 S.Ct. at 1225. Lower courts have interpreted *Reid* as holding that the reach of the Constitution does not stop at the border. Whenever the United States exercises its sovereignty outside the country, it must act in accordance with the limitations imposed by the Constitution. However, *Reid* involved U.S. citizens residing overseas. Since *Reid,* the Court has had no occasion to rule on the extra-territorial application of the Constitution to non-resident aliens. *See,* Stephan, Constitutional Limits on the Struggle against International Terrorism: Revisiting the Rights of Overseas Aliens, 19 Conn.L.Rev. 831, 834–842 (1987).

14. *See, e.g. United States v. Pinto–Mejia,* 720 F.2d 248, 259, 261 (2d Cir.1983); *United States v. Marino–Garcia,* 679 F.2d 1373, 1384 (11th Cir.1982), *cert. denied,* 459 U.S. 1114, 103 S.Ct. 748, 74 L.Ed.2d 967 (1983); *United States v. Howard–Arias,* 679 F.2d 363, 371 (4th Cir.1982), *cert. denied,* 459 U.S. 874, 103 S.Ct. 165, 74 L.Ed.2d 136 (1982); *United States v. Green,* 671 F.2d 46, 53 (1st Cir.1982); *United States v. Williams,* 617 F.2d 1063, 1078 (5th Cir.1980).

15. Notes to the Restatement provide that "although the matter has not been authoritatively adjudicated, at least some actions by the United States in respect of foreign nations outside the country are also subject to constitutional limitations." § 721 comment m & note 16.

16. Indeed, the case law in this Circuit is quite murky. In a relatively early case, the Court explicitly refused to permit foreign aliens to raise constitutional objections. *Pauling v. McElroy,* 278 F.2d 252, 254 N. 3 (D.C.Cir.) *cert. denied,* 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960) (in dismissing a suit brought by overseas aliens to enjoin nuclear testing, the Court, held that overseas aliens have no standing to assert constitutional claims). In later cases, the Court appeared more receptive to granting aliens rights under the Constitution. *Dostal v. Haig,* 652 F.2d 173, 176 (D.C.Cir.1981) (In rejecting challenge by Berlin citizens that Army violated their due process rights Court "accepted *arguendo* that the Bill of Rights is fully applicable to govern the conduct of U.S. officials in Berlin," but found no substantive violation); *Cardenas v. Smith,* 733 F.2d 909, 913 (D.C.Cir.1984) (In conferring standing on a Colombian citizen objecting to the United States government's seizure of her Swiss bank account without any notice, the Court stated that "an injury endured abroad is not less of an injury for Article III standing purposes because it happened on foreign soil.")

However, in our Circuit's most recent treatment of the subject, it explicitly refused to rule

majority view compelling and persuasive and concludes that the Constitution applies to circumscribe the activity of federal officials overseas.

## C.

### Method of Arrest as a Violation of Defendant's Fifth Amendment Rights

■ Concluding that the Constitution extends to governmental activities overseas is only the starting point of the inquiry. The Court now turns to the fundamental question raised by defendant's motion: does the Constitution impose any restraints on the methods used to arrest a defendant and bring him within the jurisdiction of this Court.

### 1.

The Supreme Court in two decisions has developed well reasoned precedents that forcible abduction neither offends due process nor requires dismissal of an indictment. *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886) and *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952). *Ker* involved a defendant who while residing in Peru was indicted for larceny in Illinois. He was forcibly abducted from Peru by a Pinkerton agent brought to Illinois, tried and convicted. *Frisbie* involved the forcible abduction—seizure, handcuffing and blackjacking—of a defendant from his home in Illinois to Michigan to stand trial for murder. The Court reasoned that "due process of law is satisfied when one present in court is convicted of a crime after having been fairly apprised of the charges against him and after trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will." *Frisbie,* 342 U.S. at 522, 72 S.Ct. at 512.

Despite intense criticism of the doctrine,[17] the Supreme Court has continued to reaffirm the *Ker–Frisbie* doctrine. *See, Immigration & Naturalization Service v. Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984); *United States v. Crews,* 445 U.S. 463, 474, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980); *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *Gerstein v. Pugh,* 420 U.S. 103, 119, 95 S.Ct. 854, 865, 43 L.Ed.2d 54 (1975) ("Nor do we retreat from the established rule that illegal arrest or detention does not void a subsequent conviction.")

### 2.

While defendant's counsel concedes that as a general rule, our jurisprudence has relied upon the safeguards of the system itself and has, on most occasions, turned a blind eye to the methods used to bring a person to Court, he nonetheless contends that this action falls into what is commonly referred to as the *Toscanino* exception, *United States v. Toscanino,* 500 F.2d 267 (2d Cir.1974). There, the defendant also alleged that he was subjected to torture and abuse by United States officials. Reasoning that the government should not be given a carte blanche to bring defendants to the jurisdiction of the United States by torture and brutal force and then permitted to utilize the fruits of its own lawlessness, the Second Circuit ruled that a court in the name of due process is required to divest itself of jurisdiction "where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights." *Toscanino,* 500 F.2d at 275.

on the application of the Bill of Rights to aliens overseas. In *Sanchez–Espinoza v. Reagan,* 770 F.2d 202, 208 (D.C.Cir.1985), a case involving Nicaraguan citizens seeking compensation for injuries suffered at the hands of the United States supported Contradoros, the court wrote "[w]e do not reach the question whether the protections of the Constitution extend to noncitizens abroad." However, it ultimately refrained from exercising jurisdiction over the action under the political question doctrine. Neither aliens nor United States citizens were conferred standing to proceed with the case. Therefore, *Sanchez* can be interpreted as holding that an alien can not assert any greater rights under the Constitution than a United States citizen.

17. For an extensive list of articles criticizing the doctrine see M. Bassiouni, II International Criminal Law, Chapter 5, note 17 (1986 ed.).

The extensive torture suffered by the defendant in *Toscanino* is worthy of recitation to illustrate the benchmark for the type of outrageous conduct necessary to invoke the exception to *Ker–Frisbie* and warrant the radical remedy of dismissal. The government abducted defendant from Uruguay and subjected him to a series of torture: denial of sleep and nourishment for days at a time, forced walks for excessive hours accompanied by kicking and beating him when he could no longer stand, pinching his fingers with metal pliers, flushing alcohol into his eyes and noses and forcing other fluids up his anal passage, and finally, attaching electrodes to his extremities and genitals. 500 F.2d at 270. Even in face of that record, the trial court refused to dismiss the indictment, concluding that United States officials were not involved in that conduct. *United States v. Toscanino*, 398 F.Supp. 916 (E.D.N.Y. 1975).

Shortly after *Toscanino*, the Second Circuit stressed the narrowness of its holding and reaffirmed the vitality of the *Ker–Frisbee* doctrine. *United States v. ex rel. Lujan v. Gengler*, 510 F.2d 62 (2d Cir.1975), *cert. denied* 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975). Although *Gengler* did not involve any allegations of torture— the defendant argued that federal officials lured him to neutral territory under fraudulent business pretenses—it stands for the proposition that absent "government conduct of a most shocking and outrageous character," dismissal is not warranted. *Id.* at 65. "Not every violation by prosecution or police ... requires nullification of the indictment." *Id.* at 66.

Although most circuits have acknowledged the exception carved out by *Toscanino*, it is highly significant that *no* court has ever applied it to dismiss an indictment. They have uniformly treated *Toscanino* as a very narrow exception to *Ker–Frisbie*. See Shafer, *District Court Jurisdiction over Criminal Suspects Who were Abducted in Foreign Countries*, 64 A.L. R.Fed 292.

Two distinct grounds have been relied upon in refusing to dismiss an indictment under the *Toscanino* exception: either courts conclude that the torturous activity did not rise to the level of outrageousness warranting dismissal, or conclude that United States officials were not directly involved in the torturous activity. In the first, the courts have used the allegations of torture in *Toscanino* as a threshold standard for outrageousness, and uniformly concluded that the government's conduct did not rise to that level of outrageousness, shocking the conscience and warranting dismissal. *See, U.S. v. Rosenthal*, 793 F.2d 1214, 1232 (11th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987) (defendant abducted from Bahamas on narcotic charges, the court declined to adopt the *Toscanino* exception but even if applicable, found no evidence of conduct which shocked the conscience); *U.S. v. Darby*, 744 F.2d 1508 (11th Cir.1984), *cert. denied,* 471 U.S. 1004, 105 S.Ct. 2322, 2323, 85 L.Ed.2d 841 (1985) (Honduran citizen abducted from Honduras, driven at gunpoint to airport, and forced on plane for trial in United States; court held that defendant had not "alleged the sort of cruel, inhuman and outrageous treatment" to warrant dismissal); *U.S. v. Reed*, 639 F.2d 896 (2d Cir.1981) (Bahamian defendant, residing in the Bahamas, deceitfully enticed by CIA agents to board a plane bound for Bimini; agents placed cocked gun at his head and forced him to lie on aircraft floor for the duration of the flight and then twisted his arm as he exited plane; court found that use of revolver and threatening language not "gross mistreatment" warranting dismissal); *U.S. v. Cordero*, 668 F.2d 32 (1st Cir.1981) (defendants arrested, abducted in Venezuela to face drug charges in Puerto Rico. In refusing to dismiss the indictment, the court concluded that although defendants were subjected to poor treatment, insulted and slapped when abducted and while in jail were poorly fed and forced to sleep on the floor, those conditions "are a far cry from deliberate torture warranting dismissal"). Several of the above cases involved serious allegations of torture and abuse. The fact that not *one* of the courts relied on *Toscanino* to dismiss the indictment highlights the

extreme narrowness of that exception and underscores the force of the *Ker–Frisbie* doctrine.

In cases where defendants have urged the court to dismiss the indictment solely on the grounds that they were fraudulently lured to the United States, courts have uniformly upheld jurisdiction. *United States v. Wilson,* 732 F.2d 404, 411 (5th Cir.) *cert. denied,* 469 U.S. 1099, 105 S.Ct. 609, 83 L.Ed.2d 718 (1984); *United States v. Wilson,* 721 F.2d 967 (4th Cir.1983). In *Wilson,* an undercover agent persuaded defendant to leave his refuge in Libya. The court refused to dismiss the indictment concluding that "Wilson has simply been the victim of a nonviolent government trick ... any irregularity in a criminal defendant's apprehension will not vitiate proceedings against him." 721 F.2d at 972.

In the second line of cases, where it was determined that the United States officials were not involved in the alleged brutality or torture, the courts saw no purpose in dismissing the indictment. *See United States v. Lopez,* 542 F.2d 283 (5th Cir.1976) (United States agents played no role in alleged torture of defendant in Dominican Republic); *United States v. Lira,* 515 F.2d 68 (2nd Cir.1975) (defendant charged with distribution of narcotics beaten and tortured with electrodes by Chilean police, no involvement by United States police). The purpose underlying the *Toscanino* rule is to deter police misconduct by barring the government from using the fruits of its deliberate lawlessness. When the United States is not involved in the torturous activity, no purpose would be served by dismissing the indictment.

### 3.

In this action, there is no dispute that United States law enforcement officers were fully involved in the planning and execution of defendant's arrest. However, defendant has failed either to allege or to show any actions committed by these officers that meet the standard of outrageousness established by *Toscanino* and its progeny requiring this Court to divest itself of jurisdiction.

The record in this proceeding has been reviewed with care and the Court fails to find the type of cruel, inhumane and outrageous conduct that would warrant dismissal under *Toscanino.* That is not to say that the Court accepts the government's representations in its December 1, 1987 response to defendant's pretrial motion that Yunis "was treated with the greatest care and with due deference to whatever personal requests he made during the voyage from the Mediterranean to the United States." Even the government has admitted that "there may well have been in hindsight too much force brought upon Mr. Yunis' wrists" when he was forced down and thrown to the deck during the course of his arrest. Trans. of Motions Hearing, Dec. 23, 1987, at 38. Indeed, the two agents immediately involved believed that the amount of force and method used in effectuating the arrest were necessary to ensure that the defendant did not attempt to jump overboard.

Similarly, although the defendant may not have been given the best or even adequate medical care, the treatment provided was not so poor as to be "cruel and inhumane." The testimony of the three treating physicians, Drs. Braddock, Gore and Gabriel refuted the government's representations that the doctors remained at Yunis' "beckon call. [sic]" Trans. at 45 (Dec. 23 1987). Indeed, despite the defendant's constant complaints concerning the condition of and the pain emitting from his fractured wrists, the orthopedist, Dr. Gore, did not examine Yunis until September 15, the third day into the naval voyage. When he conducted his initial examination of the defendant's wrists, he recommended ice treatment and elevation and at the motions hearing testified that in his judgment placing casts on the defendant's wrists without the use of x-ray would be "excessive and overkill." Tran. of Jan. 20, 1988 at 187.[18] Dr. Keith Gabriel, the physician who treated Yunis after he entered the United States, offered alternative advice. Given the defendant's symptoms and in the absence of x-ray facilities, he would have "at

---

**18.** It is undisputed that there were no x-ray facilities on board the Butte.

least offer[ed] the patient some type of immobilization, whether that might be a splint or a cast, or simply an adhesive wrapping, like an ace wrap." Trans. of test., Jan. 25, 1988, at 39. However, merely because the two doctors prescribed contrary treatment, does not transform Dr. Gore's at worst negligent diagnosis and prescription into malicious, inhumane conduct. Moreover, the defendant's nausea and sea sickness were certainly not the result of any deliberate actions by the government. Indeed, several of the FBI agents involved in the operation appeared to suffer from motion sickness.

Finally, even if the procedure employed in transporting the defendant by airplane from the Saratoga to the United States was extremely confining, it did not rise to the level of outrageousness that shocks the conscience. S.A. David Johnson, who was primarily responsible for the hostage rescue team, testified that it was necessary to tranquilize the defendant and place him in the Stokes litter due to the size of the plane and the need to protect the aircraft and the personnel on board. Trans. of Johnson at 53.

#### 4.

Even if the Court were to accept each and every allegation of excessiveness made by the defendant, taken together, they simply do not rise to the deliberate torture and abuse alleged in *Toscanino*. However, the defendant is not left without any relief from the government's allegedly illegal law enforcement practices. He is afforded all the procedural and substantive constitutional safeguards provided every criminal defendant facing trial.

Indeed, the discussion and resolution of defendant's motion to suppress, which follows, demonstrate the premise and significance of the *Ker–Frisbie* doctrine—that a defendant's rights to due process of law are satisfied by the protections afforded a defendant at trial.

### III.

### MOTION TO SUPPRESS DEFENDANT'S STATEMENTS

The Court's conclusion that the signed, written confession which the FBI secured from Fawaz Yunis while on board the Butte should be suppressed is not based on any single factor. Rather, that conclusion hinges on a number of events, all of which transpired during the period, beginning when Yunis was arrested on September 13, 1987, on board the motor yacht and ending in the late evening of September 16, when he signed the written confession. The events leading to and resulting in the confession when considered as a whole, present serious constitutional and other questions as to whether the confession was made pursuant to a knowing and voluntary waiver of rights. And more importantly, they are questions that cannot be ignored, glossed over or covered up. They include: the serious wrists injuries which Yunis sustained at the hands of the FBI agents when he boarded the yacht and was arrested; the seasickness and other medical problems that defendant developed and experienced during the approximate one hour transfer from the yacht to the Butte; the perfunctory 20 to 30 minute medical examination Yunis underwent when he boarded the Butte; the failure to diagnose and immediately treat defendant's wrist injuries; the short interval of time between his arrival on the Butte and the time that the FBI agents secured a waiver of rights and commenced their interrogation; the inadequacy of subsequent medical attention while aboard the Butte; the deliberate four day delay in rendezvousing with the Saratoga; and, the absence of any audio or video recording of the nine interrogation sessions between the FBI agents and the defendant.

Adding to all of this was the defendant's complete inability, or at best, meager ability, to speak and understand the English language and the fact that he did not have an attorney nor any detached and interested person to whom he could turn and seek counsel and advice, at a time when he was being closely interrogated by two experienced FBI agents, Hansen and Droujinski; the qualified FBI interpreter.

This combination of events together with Yunis' severely weakened physical state,

placed him at a distinct disadvantage where he could scarcely understand intelligently his rights as explained and translated to him, much less to be able to voluntarily waive them.

Given these circumstances, the Court is compelled to find that defendant's oral statements and written confession fell far short of complying with the standards required under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and other like pronouncements of our Supreme Court. *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *Tague v. Louisiana,* 444 U.S. 469, 470–471, 100 S.Ct. 652, 653, 62 L.Ed.2d 622 (1980) (per curiam); *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979).

After considering the several days of direct and cross examination testimony of government witnesses who had personal interaction with Yunis during his nearly 100 hour voyage through the Mediterranean, and after carefully weighing and assessing their statements, the Court concludes that the statements were solicited by federal law enforcement agents in violation of defendant's fifth amendment rights and the provisions of 18 U.S.C. § 3501(c) prohibiting unreasonable delay before presentment to the nearest United States Magistrate.

### A.

#### *Fifth Amendment Violations*

1. *Factual Analysis*

■ Yunis' counsel claims that the pressure of the situation beginning with the apprehension and arrest, the injuries defendant received before he was advised of his rights and interrogated, and the stormy and unsettling conditions of the Mediterranean Sea, encountered in effecting the transfer to the Butte, all of these factors deprived him of the mental and physical alertness necessary to participate in any type of interrogation. While government counsel argues that all necessary precautionary measures were employed, the Court finds otherwise.

There can be little argument that the wrist injuries defendant sustained were a result of the aggressive and forceful arrest completed by agents Gast and Glasser when he was "taken down" on the yacht.[19] Moreover, the undisputed testimony of agents Johnson, Hansen and Revell was that Yunis suffered and complained of throbbing and numbing pain in both wrists from that moment, continuing on throughout his confinement on the Butte. Trans. of Johnson at 83; Trans. of Hansen at 51 and Trans. of Revell at 197. Nor was there any dispute in the testimony that the motor yacht slogged through an unusually rough, churning and rolling sea. This left defendant in a nauseous and exhausted condition. Indeed, agents Johnson, Droujinsky and Revell confirmed the fact that during the transfer operation, Yunis regurgitated on at least two occasions. Trans. of Johnson at 47–48; Trans. of Droujinsky at 107–109; and Trans. of Revell at 196. While it was very evident that defendant suffered severely from motion sickness, he was not given medication, until late in the evening of September 13, 1987.[20] This was *after* he had been advised of his rights and interviewed by the FBI agents. The record also

---

**19.** Despite his complaints, defendant did not obtain a thorough examination of his wrists until the second day at sea. At that time, Dr. Braddock found the wrists swollen, bruised, and tender and their range of motion constricted. Trans. of Braddock at 38, 40. Since the wrists were not "obviously deformed," he recommended treatment with ice and elevation. The orthopedic surgeon, Dr. Gore who was aboard the Butte was not consulted until the third day; he too prescribed ice and elevation.

It was not until Yunis arrived in the United States that he received adequate examination and treatment of his wrists. On September 19,

1987, Dr. Andy Jagoda determined that both wrists were fractured and required immobilization. Short arm plaster casts were placed on the defendant's arms. Later, defendant was examined by Dr. Keith Gabriel who reaffirmed Dr. Jagoda's diagnosis. Dr. Gabriel testified that given defendant's recurring wrist pain he would have immobilized the wrists from the outset. Trans. of Gabriel at 39.

**20.** The agents, on the other hand, aware of the debilitating effects of motion sickness, had all taken medication before boarding the motor yacht.

shows that immediately following Dr. Braddock's initial examination but before the agents' interrogation he vomited into a waste basket in his hot and cramped detention room. Trans. of Braddock at 89. Again, later that evening during a second medical examination he became nauseated and had dry heaves. *Id.* at 88. Indeed, the record is clear that defendant experienced continued nausea and dizziness throughout the first two days on board the Butte.

During Dr. Braddock's limited initial visit he did not closely examine defendant's wrists, did not prescribe any medication, or such treatment as splints or wrist supports. The fact is that he was not advised of any problem with defendant's wrists until the next morning when he was fully informed by one of the guards on duty. However, S.A. Hansen, present during the examination, was aware that Yunis was suffering wrist pain. Indeed, he testified that during the examination Yunis "displayed a slight reaction or a wince when his wrists were examined ... he attempted to withdraw his arms." Trans. of Hansen, Jan. 28, 1988 at 51.

It is also worthy of comment that at the conclusion of his initial examination Dr. Braddock noted that defendant had experienced earlier episodes of vomiting, and concluded that he was currently feeling nauseated and lightheaded. Trans. of Braddock at 70. Further, during his cross-examination Dr. Braddock acknowledged that Yunis' condition was exacerbated by "psycological stress due to captivity." *Id.* at 76–77.

The doctor did not prescribe medication to relieve the nausea. His sole recommendation was "rest and clear liquids." *Id.* at 83. However, the defendant did not receive the prescribed "rest." Instead, immediately following the medical examination, agents Hansen and Droujinsky commenced their interrogation of Yunis.

And interestingly, during the course of his testimony, the doctor readily admitted that seasickness, which the defendant experienced, could seriously affect a person:

motion sickness ... alone makes it difficult to concentrate, think clearly ... people ... just kind of feel like they want to go lie down somewhere.... Just feeling kind of drained and kind of lack of energy, lethargic. Not necessarily even nauseated.

*Id.* at 87–88. He concluded his testimony by acknowledging that Yunis' seasickness could, in the words of his counsel, bring about "an inability to deal with anything at that particular moment." *Id.* at 88.

It has already been noted, *supra* p. 914, that defendant was examined in a small 8' × 10' room described as "uncomfortably warm." Dr. Braddock estimated the temperature in the room at 85 degrees Fahrenheit due to an inoperable or covered air duct. In discussing the effect of inadequate ventilation with the agents he testified: "we kind of felt ... it might make matters worse, contributing perhaps to overall feelings of being closed in ... and make him feel more ill." *Id.* at 86.

In addition to the debilitating effects of the motion sickness, defendant was suffering from some degree of dehydration. He had not been eating solid foods, had vomited numerous times, and was confined in an extremely warm room. While in Dr. Braddock's opinion, Yunis was not clinically dehydrated, he admitted that the laboratory tests indicated possible dehydration. *Id.* at 94–95. Dr. Gore testified that a "relative amount of dehydration" was evident from the laboratory tests and that the defendant was in "some dehydrated state." Trans. at 165–66. This dehydration added to the defendant's dizziness and contributed further to his debilitated condition.

Despite defendant's weakened physical condition, the FBI commenced their first interrogation soon after the arrest and rough passage to the Butte. They saw and knew that he was in a weakened state and susceptible to persuasion. They advised defendant of his *Miranda* rights just minutes after the doctor's admonition that he required rest and clear liquids. They never reiterated the *Miranda* warnings in the eight subsequent interrogations. Trans. of Hansen, Jan. 28, 1988, at 73, 76–77, 79, 85.

In view of defendant's debilitating physical condition when he was first given his

rights, it would have been prudent for the government to readvise Yunis of his rights when his condition had improved. Throughout the entire period, according to Dr. Braddock's testimony, the several FBI agents never inquired of him whether the defendant was in a position to be interrogated. Nor was he ever told as to what the FBI agents were doing. Trans. of Braddock at 83–84. Indeed, the doctor testified that if he had known that defendant was up talking and responding to the interrogation of the FBI agents he would have given Yunis some type of medication. *Id.* at 98.

Yunis was alone with Special Agents Hansen and Droujinsky for many hours, answering their detailed and exhaustive questions. The lengthy questioning was part of a careful plan. The main interrogator, S.A. Hansen, testified that he had anticipated questioning Yunis while he was held aboard the U.S.S. Butte for four days and one of the tasks he had hoped to accomplish was to get Yunis to sign a statement. Trans. of Hansen, Jan. 28, 1988 at 84.

Several additional facts contribute to the Court's findings that Yunis did not understand the full nature of the rights being abandoned nor the consequences of his decision to relinquish them.

First, his counsel pointed out several errors in the Arabic translation of the "Advice of Rights" form provided the defendant. The testimony demonstrated that portions of the form had been copied incorrectly leaving out several crucial words and letters. Trans. of Droujinsky at 124–29; Trans. of test., Nicholas Hreiz, Jan. 27, 1988, at 44–54. As a result, several words were either incomplete and unintelligible or took on a different meaning. Both S.A. Droujinsky, the regular interpreter, and S.A. Nicholas Hreiz, an FBI translator, testified that the errors were not significant, and that the meaning of the words could be readily inferred from the context of the sentence. Trans. of Hreiz at 55. These agents were of course extremely familiar with the nature and meaning of the *Miranda* rights. When asked if another person could read the Arabic *Miranda* form

and come to a different conclusion about the meaning of the words, agent Hreiz answered, "possibly, yes." *Id.*

The mistakes in the form, and the agents' rather unconcerned and indifferent response to the errors underscored an approach to their task as interpreters, an approach which is troubling to the Court. While S.A. Droujinsky is undoubtedly a skilled linguist, he and Hreiz seemed to have taken for granted the defendant's ability to comprehend *Miranda* warnings and the consequences of waiver. It was clear from the testimony of the two, that their translations and interpretations were influenced by their backgrounds: United States citizenship, American college educations, United States military service and career service as FBI agents. Defendant Yunis, however, was not an American citizen and was not conversant with *Miranda*. As a Lebanese citizen, he did not grow up watching Hawaii Five–O or Matlock and had nothing in his day-to-day experience to draw upon. The Court was simply unconvinced that the defendant understood the incomplete and erroneous "Advice of Rights" form well enough for a knowing and intelligent waiver.

Another deficiency noted was the absence of audio and video recordings. In the detailed planning for Operation "Goldenrod" it is surprising that the government, knowing well in advance that it intended to interview defendant during the four day voyage, never factored into its carefully developed plans the possibility of recording by audio or video tape, the several interrogation sessions. The record is clear from the testimony that the necessary equipment was immediately available at all times.

Use of such equipment would have laid to rest any questions as to whether or not the rights warnings and the defendant's subsequent questioning met all *Miranda* and due process requirements. If such equipment had been used, the record could have been presented in its naked and bare form, erasing the troubling questions now presented.

Agent Hansen was questioned about the use of video equipment and responded that agency policy prohibited video confessions and statements. On the other hand, Executive Director Revell testified that there was no prohibition against video taping but in practice the presence of a camera was "considered intimidating" and that "it [was] not a practice that we engage in." Trans. at 209–210. Mr. Revell later submitted a regulation adopted July 29, 1975 relating to tape recording of interviews. That regulation provided for certain safeguards to preserve the integrity of the interview.

The use of audio and video recordings by the FBI is generally known by all familiar with its criminal investigations and proceedings. Operation "Goldenrod" presented the very type of situation involving uncalculated risk along with large expenditures of money and resources where videotaping would have been wise. Videotaping defendant's confession would have protected defendant's rights while at the same time providing a strong basis for ensuring the admissibility of the confession at trial. It would have demonstrated the voluntariness of the confession and provided an effective rebuttal to defendant's *Miranda* claims. *See* Comment, *Corroborating Confessions, an Empirical Analysis of Legal Safeguards Against False Confessions,* 1984 Wisc.L.Rev. 1121, 1190 (1984).

The FBI missed an excellent opportunity to dispel any doubts and questions and to ensure that all lawful and constitutional guarantees were fully observed. It would have been a very simple undertaking to preserve in detail by audio and video tape, all of the nine interview sessions with the defendant.

## 2. *Legal Analysis*

Defendant's suppression motion addresses a fundamental protection afforded criminal defendants under our Constitution—the right against compulsory self-incrimination. The fifth amendment of our Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." This right attaches and becomes "fully applicable during a period of custodial interrogation." *Miranda v. Arizona,* 384 U.S. 436, 460–61, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966).[21] Concluding that even the briefest period of interrogation necessarily involves compulsion,[22] the Court formulated procedural safeguards designed "to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." *Id.* at 469, 86 S.Ct. at 1625. Consistent with this purpose, a suspect may waive his fifth amendment privilege, "provided the waiver is made voluntarily, knowingly and intelligently." *Id.* at 444, 86 S.Ct. at 1612.

Once the State elicits a confession it bears the burden of proving that it was made pursuant to a voluntary, knowing, and intelligent waiver. That burden is a "heavy" one. *Id.* at 475, 86 S.Ct. at 1628. Courts are to "indulge every reasonable presumption against waiver of fundamental constitutional rights" and they shall "not presume acquiescence in the loss of fundamental rights." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Furthermore, while an express written or oral waiver of the right to remain silent or of the right to counsel offers proof of the validity of that waiver, it does not inevitably establish the sufficiency of the waiver. "The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979).

---

**21.** In *Miranda,* the United States Supreme Court concluded that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* at 467, 86 S.Ct. at 1624.

**22.** The *Miranda* court stated at 461:
> An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to ... techniques of persuasion ... cannot be otherwise than under compulsion to speak.

For a discussion, *see* Schulhofer, Reconsidering *Miranda,* 54 U.Chi.L.Rev. 435, 445–46 (1987).

Recently, the Supreme Court has held that this inquiry has two distinct dimensions:

> First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).

The foregoing findings of the Court concerning the circumstances surrounding the interrogation, the duration and conditions of Yunis' confinement on the Butte, his physical and mental condition, and the FBI's continual interrogation, viewed in their entirety, demonstrate that defendant did not knowingly and voluntarily forego his rights when making his inculpatory oral and written statements to the FBI. In making a determination whether the defendant's statements were made voluntarily or were the product of coercion, the Court has taken into account "the duration and conditions of detention ..., the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control." *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961).

It is important to recognize that the *Miranda* warning was given defendant during a time period, immediately following his arrest, when his wrists had been broken, when he was not receiving appropriate treatment, when he was suffering greatly from the debilitating effects of seasickness, and had not received medication for his motion sickness.

The added factors of the defendant's confinement in an overheated small room and his possible dehydration lead this Court to find that the defendant was in an extremely weakened physical condition at the very time when he was explained his rights. In an uncertain physical condition, in an oppressive environment, and subject to relentless interrogation, Yunis lacked the will necessary to voluntarily waive his rights. Further, without a comprehension of the English language or the American justice system, he certainly could not be expected to have understood the nature of his rights nor the consequences of abandoning them.

The United States Supreme Court has required that to suppress a defendant's statements the trial court must find police overreaching. *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). In that case, the defendant approached a uniformed police officer and, without prompting, confessed that he had murdered someone and wanted to talk about it. The police officer repeatedly advised him of his *Miranda* rights and the defendant continuously asserted he understood, but he still wanted to talk about the murder he had committed. The Supreme Court held that the police had not engaged in any coercion or offensive interrogation techniques. This case differs markedly from *Connelly;* here, the FBI swooped down upon the defendant in overwhelming numbers, aggressively arrested him, confined him to a small room, and interrogated him on nine occasions within four days while aboard a naval vessel in the middle of the Mediterranean.

Indeed, the government had deliberately scheduled four days for the voyage across the Mediterranean; four days which Yunis would be subjected to constant questioning by the agents. The agents carried out their plan with determination, ignoring Yunis' physical state and Dr. Braddock's prescribed treatment. The relentless interrogation by the FBI provides the "essential link between coercive activity of the State, on the one hand and a resulting confession by a defendant, on the other." *Connelly,* 107 S.Ct. at 521. The defendant's will was overborne by the interrogation and his capacity for self-determination was critically impaired. His waiver cannot be regarded as voluntary.

### B.

### *Delay Between Arrest and Arraignment*

■ Yunis' counsel also argues that the delay between arrest and arraignment was

unreasonable and violated § 3501(c) of Title 18. Section 3501(c) provides that a confession made by a defendant while he is under arrest or in custody shall not be inadmissible solely because of delay if made voluntarily and within six hours following his arrest. A further exception is provided if the delay "is found ... to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate or other officer." *Id.*

The determination of reasonable delay under 3501(c) requires a consideration of the mode of transportation and the distance traveled. In this case, defendant was arrested more than four thousand miles from the United States. The transportation plans developed involved a combination of travel by sea and air. While it was clear that the aircraft travel was speedy and direct, the defendant's travel across the Mediterranean was neither direct nor swift. Indeed, as noted, *supra* p. 912, the government deliberately scheduled a four-day voyage across the Mediterranean to allow the FBI sufficient time to interview and secure a statement from Yunis. Given that goal, no efforts were made to shorten the period.

Captain Joseph Davis testified that his orders specified a date, time, and position at which his vessel was to rendezvous with the Saratoga in the western Mediterranean and that a "four-day delay [was] in the plan." Trans. at 55 and 93. Meanwhile, the Butte made two detours from its charted route, each time to permit certain passengers to disembark. After those detours, the Butte merely increased its "cruising" speed to a maximum of 21 knots to make up for the lost time. Otherwise, it proceeded at its usual speed of 15 knots per hour. Chief Quartermaster Espinosa, testified that if the ship had taken a more direct course and maintained a speed of 20 knots, it could have rendezvoused with the Saratoga almost a full day earlier. Trans. at 164–65. And thus, the delay between arrest and arraignment could have been shortened considerably. The delay also could have been reduced measurably if the Navy had used other available vessels with greater speed capability. The United States Sixth Fleet was then available in the Mediterranean with its full complement of vessels.

The record is barren of suggestions that alternative means of transportation were ever seriously considered. Agent Hansen testified that he had explored a "few possibilities," but found "no sea planes available in that part of the world." Trans. of Hansen, Jan. 28, 1988, at 24–26. It is difficult to believe that in this advanced age of technology where supersonic jets and the like are commonplace, that our United States military could not have proposed and employed faster alternatives.

The FBI's reliance on the Butte was ill-placed. The slow voyage across the Mediterranean appeared to serve only the government's purposes—ample time to educe a confession. This was a clear abuse of the obligation to bring the defendant before a judicial officer immediately following his arrest. The exception to the six hour limitation is not designed to allow law enforcement agencies to take their time and choose a slower, albeit, convenient transportation mode. Deliberate or not, the government completely disregarded the statutory requirements.

Unreasonable delay alone, however, does not automatically render all statements obtained prior to the delay inadmissible. *United States v. Elkins*, 774 F.2d 530, 534 (1st Cir.1985). The Court's inquiry must also focus on how the interim period was used by the government. "It is not the lapse of time, but the use of time, ... to employ the condemned psychologically coercive ... practices which is proscribed by the cases." *United States v. Rubio*, 709 F.2d 146, 153 (2d Cir.1983) (quoting *United States v. Marrero*, 450 F.2d 373, 376 (2d Cir.1971)). The Court has already determined that the government purposely created the delay between arrest and arraignment to interrogate the defendant and secure a statement. That deliberate action coupled with the lengthy and relentless interrogation was all to the defendant's prejudice and detriment and violated the provisions of 3501(c).

## C.

### Sixth Amendment Violations

■ Yunis' sixth amendment claim is twofold: he had the right to an attorney at the moment the FBI commenced interrogation; and he was totally unfamiliar with and lacked an understanding of the American criminal justice system. Because of these conditions, he therefore, could not knowingly and intelligently waive his right to counsel. The government counters, simply by suggesting that his sixth amendment rights had not yet attached. In its brief dismissal of defendant's argument, the government relies solely upon a 1986 United States Supreme Court case, *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410.

In that proceeding, Justice O'Connor held that the defendant's inculpatory statements took place before the initiation of adversary proceedings and therefore his right to counsel had not attached. She relied upon *United States v. Gouveia,* 467 U.S. 180, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984), which held that the defendant has the right to the presence of an attorney during any interrogation occurring after the first formal charging proceeding. 467 U.S. at 187, 104 S.Ct. at 2296. In *Gouveia,* the Court made clear that until such time as the "government has committed itself to prosecute, and ... the adverse positions of government and defendant have solidified" the Sixth Amendment right to counsel does not attach. *Id.* at 189, 104 S.Ct. at 2298 (quoting *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972)).

However, it is clear from the facts here that the federal government had long since committed itself to prosecute Yunis. It had engaged in a two-year investigation; the abduction of Yunis took six months to plan and involved several government agencies, considerable personnel, and various resources, financial and physical.[23] Trans. of Revell at 167–68. In short, the government was not just bringing another defendant into the station house for questioning. It was committed to bringing an alleged terrorist to trial. The fact that the indictment charging Mr. Yunis with violating several United States laws was returned on September 15, 1987, halfway through his custodial journey across the Mediterranean, does not change the fact that his right to counsel had attached at the outset of the interrogation.[24] A warrant had been issued for defendant's arrest on September 11, 1987, the government had presented its evidence to the grand jury seeking an indictment, and an extremely complicated abduction operation had all been planned prior to his custodial interrogation.

The Court is extremely troubled by the fact that despite the meticulous detail of Operation "Goldenrod," the government failed to have an attorney available. If the FBI could arrange to have a medical surgical team of five doctors and several tons of medical equipment aboard the Butte,[25] would it have been too difficult to arrange for a competent and detached attorney?

When government chief counsel was asked during closing argument why such provisions were not made, he responded in what appeared to be a near apologetic tone:

I don't know the answer ... it just didn't come up.[26]

Counsel, however, neglected the fact that individuals planning the operation had, indeed, discussed providing Yunis with counsel but deliberately decided not to do so in order to elicit a confession. In fact, they sought to frighten defendant into making a confession by keeping him in an isolated, intimidating environment for an extended period of time. By placing him in such an alienating situation without benefit of coun-

23. At least a dozen FBI agents were involved, the members of the Hostage Rescue Team. A special medical staff of five was brought aboard the Butte. There were several hundred naval personnel on the Butte and its sole mission was to deliver the defendant to the Saratoga. A naval pilot flew the S3 to the United States flanked by an Air Force tanker jet with a crew of two pilots.

24. The government's attorney noted in his closing argument of February 5 "that [defendant] was indicted before the confession was obtained, I believe. Actually, it was spontaneously [sic] while he was talking." Trans. at 54.

25. *See* Trans. of Braddock at 55.

26. Trans. of Feb. 5, 1988, at 41.

sel, the government hypothesized, and rightly so, that defendant would be more likely to confess.

From the minute of his arrest, Yunis was told that he had all the rights of a United States citizen. The government cannot now argue that his right to an attorney had not vested. An arrest warrant had already been issued and the government was committed to prosecute. Therefore, the defendant's sixth amendment right had crystallized. This right to counsel is "indispensable to the fair administration of our adversarial system of criminal justice." *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 483, 88 L.Ed.2d 481 (1985).

■ A defendant's waiver of his sixth amendment right to counsel,[27] is only valid, if made knowingly and voluntarily.[28] For the same reasons the Court concluded that Yunis failed to waive his fifth amendment rights knowingly and voluntarily, it likewise determines that his sixth amendment right to counsel was not waived.[29]

Somewhere along the way, in its zeal and determination to indict and prosecute an alleged hostage-taker and hijacker under recent Congressional enactments, and in securing Fawaz Yunis' written confession, the FBI failed to comply fully with constitutional restraints and precedential Supreme Court decisions. In our criminal justice system, law enforcement agencies must follow the letter and the spirit of the law, even though the accused is not a citizen of the United States. It failed to do so

in September 1987 when it interrogated the defendant.

For the reasons presented above, it is this 23rd day of February, 1988,

ORDERED

That defendant's motion to dismiss the indictment based on an alleged illegal arrest is denied.

That defendant's motion to suppress his confession because he did not voluntarily and knowingly waive his *Miranda* rights, and for other stated reasons, is granted.

---

**27.** *See Faretta v. California,* 422 U.S. 806, 834, 95 S.Ct. 2525, 2540, 45 L.Ed.2d 562 (1975). The right to waive counsel and represent oneself is grounded in our respect for personal autonomy. However, the exercise of that right depends upon the knowledge of and ability to comprehend the American justice system. As discussed *supra,* defendant lacked such an understanding.

**28.** *See Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977) "To demonstrate a valid waiver the State must prove 'an intentional relinquishment or abandonment of a known right or privilege.'" (quoting *Johnson v. Zebst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)).

**29.** It is undisputed that the standards for waiver of fifth and sixth amendment rights are at least equivalent. If anything the sixth amendment standard is more rigorous. *See, e.g., United States v. Shaw,* 701 F.2d 367, 380 (5th Cir.1983),

*cert. denied,* 465 U.S. 1067, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984); *United States v. Mohabir,* 624 F.2d 1140, 1148 (2d Cir.1980); but *cf. Pittman v. Black,* 764 F.2d 545, 547 (8th Cir.), *cert. denied,* 474 U.S. 982, 106 S.Ct. 389, 88 L.Ed.2d 341 (1985). The Supreme Court, however, has not resolved whether separate standards should exist. In *Moran,* it explicitly reserved whether a *Miranda* waiver "necessarily operates as a general waiver of the right to counsel for all purposes." 106 S.Ct. at n. 2 1145.

For a discussion of the different purposes served by the implicit right to counsel in the fifth amendment and the explicit right to counsel in the sixth amendment, and the resulting need for different waiver standards *see,* Tomkovicz, Standards for Invocation and Waiver of Counsel in Confession Contexts, 71 Iowa L.Rev. 975 (1986).