**UNITED STATES of America, Appellant,**

v.

**Fawaz YUNIS, Appellee.**

**No. 88–3036.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 19, 1988.

Decided Oct. 14, 1988.

As Amended Nov. 17, 1988.

Robert J. Erickson, Atty., Dept. of Justice, with whom Jay Stephens, U.S. Atty., J. Ramsey Johnson, and Jennifer Gold, Attys., Dept. of Justice, Washington, D.C., were on the brief, for appellant.

Francis D. Carter, Washington, D.C., appointed by the Court, for appellee.

Before MIKVA, BUCKLEY and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

Special concurrence filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

In this case, we examine whether the government protected familiar constitutional rights in highly unfamiliar circumstances. Appellee Fawaz Yunis is a citizen of Lebanon. In September 1987, agents of the Federal Bureau of Investigation (FBI) arrested Yunis in international waters off the coast of Cyprus for having allegedly led the 1985 hijacking of a Royal Jordanian Airlines jet in Beirut. American citizens were among the passengers on board that airplane, and thus the hijacking violated American law. *See* 18 U.S.C. § 1203 (Supp. II 1984).

Yunis awaits trial in the district court, but the case comes before us for review of a pretrial order. In February of this year, the district court granted Yunis' motion to suppress the use of his confession as evidence at trial. The government appeals the suppression order under jurisdiction granted in 18 U.S.C. § 3731 (1982).

The FBI obtained the disputed confession during part of Yunis' transit to the United

States, aboard a naval war ship. The trial judge found that the government secured this statement in violation of the fifth and sixth amendments and of 18 U.S.C. § 3501(c) (1982). The latter statute governs the use at trial of confessions obtained following arrests and prior to arraignment. Delays in transporting defendants to an arraigning magistrate must be "reasonable"; the district court held that the time taken to transport Yunis was not. We disagree with both the constitutional and the statutory rulings of the trial judge, and we therefore reverse the suppression order.

## I. BACKGROUND

On June 11, 1985, five armed men boarded Royal Jordan Airlines Flight 402, shortly before its scheduled departure from Beirut, Lebanon. The hijackers ordered the pilot to fly to Tunis, where a conference of the Arab League was underway. They demanded "to meet with representatives of the Arab League and to secure the removal of all Palestinians from Lebanon." Appellant's Brief at 3. Tunisian officials, however, refused to allow the airplane to land; the airplane was forced, instead, to stop in Cyprus and Sicily before eventually returning—some 30 hours after it had been commandeered—to the Beirut airport. There, passengers were allowed to disembark, the hijackers held a press conference on the tarmac (reiterating their demands regarding the Palestinians), the airplane was blown up, and the hijackers disappeared into nearby neighborhoods of Beirut.

Investigation of this crime by American law enforcement officials eventually focused on Yunis as the probable leader of the hijackers. Accordingly, the FBI—in concert with other federal agencies—developed "Operation Goldenrod." With the aid of an informant in the Middle East, Operation Goldenrod sought to lure Yunis into international waters to effect his arrest. The plan succeeded on September 13, 1987, when Yunis boarded a yacht manned by FBI agents in the eastern Mediterranean—allegedly drawn there by the promise of a profitable drug transaction. Yunis was promptly arrested by means of a "take down": agents on either side of Yunis grabbed his arms and kicked his feet out from under him, so that he ended up face down on the deck of the boat. He was handcuffed and shackled and then told that he was under arrest and was being taken to America to stand trial for the 1985 hijacking. The yacht proceeded to a prearranged rendezvous with an American munitions ship—The USS Butte—of the United States' Sixth Fleet. Yunis and two agents on the yacht boarded a transfer boat, which was then hoisted up the side of the Butte. In the process, the mechanical hoist failed and the boat's occupants were left swaying in midair as the Butte's crew completed the operation by hand. During this time, Yunis evidently grew seasick and either experienced dry heaves or vomited over the side of the boat.

Once on board the Butte, Yunis was taken to a small room that was to be his living quarters for the next four days, as the Butte made its way westward across the Mediterranean. The room was small—eight by ten feet—and poorly ventilated, as a malfunctioning vent evidently blew hot air into the room; the room's estimated temperature was 85 degrees. Although there were no windows, a hatch door (which at all times remained open) gave out onto a deck area, with some exposure to the ocean. In this room, a naval doctor examined Yunis and found him to be in good health, aside from his seasickness. During the examination, an FBI agent who was fluent in Arabic served as interpreter, since Yunis speaks very little English. The doctor did not notice any problem with Yunis' wrists, and Yunis did not complain about them at this time. However, it was later established by x-rays (after Yunis reached the United States) that both wrists had been fractured, apparently when the FBI agents first arrested him by means of the "take down."

When the doctor concluded his exam, he prescribed rest and clear liquids to alleviate Yunis' seasickness. The doctor then left Yunis' room, and FBI Special Agent Thomas Hansen, who was in charge of investi-

gating the 1985 hijacking, began to talk to Yunis—communicating through the FBI interpreter. At the outset, Yunis was told that when he reached the United States he "would be appointed an attorney and would be formally charged . . . [and then] would go through a number of legal proceedings which may terminate in a trial." Transcript of Suppression Hearing (hereinafter "Trans.") of 1/28/88 at 106. Agent Hansen further informed Yunis that "from this point forward, he would be afforded all the rights of a citizen of the United States [a]nd that he didn't have to be concerned with the fact that he wasn't an American, that now those rights would apply to him." *Id.* at 107. The agents then gave Yunis a form, on which the warnings required under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 69 (1966), were written in Arabic. Yunis was asked to read these warnings; thereafter, agent Hansen read the warnings aloud in English and the FBI interpreter translated each warning orally into Arabic. Both agents subsequently testified that Yunis was repeatedly asked whether he understood what had just been read to him and that Yunis answered affirmatively. Trans. of 1/28/88 at 109–15; Trans. of 1/26/88 at 122.

After thus informing Yunis of the constitutional rights that are afforded American citizens, agent Hansen asked Yunis "whether he was, knowing these rights, was he willing to talk to Agent Droujinsky [the interpreter] and myself about the hijacking. . . . He said yes. And then I requested that he sign the form." Trans. of 1/27/88 at 115. Between the time that agent Hansen initiated the conversation and the time that Yunis agreed to answer questions about the hijacking, nine minutes elapsed.

Yunis did sign the form and then, in response to agent Hansen's questions, began to recount the hijacking—how he was assigned to lead the 1985 hijacking by officials of Lebanon's Amal militia (of which he was then a member), how he and his accomplices arrived at Beirut Airport and boarded the Royal Jordanian airliner, and so on. After about half an hour of interrogation, Yunis said he felt sleepy, and agent Hansen proposed that they go out on the deck for some fresh air. Once outside, however, Yunis felt nauseous. Accordingly, agent Hansen told Yunis he could lie down in his room, and the first interrogation session ended.

In the afternoon, Yunis again experienced seasickness and vomited once. The naval doctor returned to examine Yunis in the early evening. During the examination, Yunis experienced dry heaves; the doctor once again prescribed clear liquids and rest. Not long thereafter, agent Hansen and the interpreter asked Yunis if he wished to resume talking, and Yunis consented. Neither at this time nor during any of the seven subsequent interrogation sessions on board the Butte did agent Hansen readminister the *Miranda* warnings. This second period of questioning was conducted out on the deck, rather than in the room. After talking for about forty minutes, Yunis indicated that he was again feeling seasick, and the session ended. Before Yunis went to sleep, he was given a scopolamine patch, which gradually releases medication through the skin behind the ear to mitigate nausea.

Early the following morning, Yunis ate a substantial breakfast but again became sick to his stomach and experienced dry heaves. The naval doctor again examined him, and on this occasion Yunis specifically complained that his wrists were bothering him. The doctor found Yunis' wrists "mildly swollen and . . . [t]he right wrist had a bit of a bruise on th[e] inner part of the wrist." Trans. of 1/20/88 at 38. The injury was treated with ice packs and by keeping the wrists elevated. *Id.* at 40.

Later that morning, agent Hansen and his interpreter returned, and Yunis agreed to resume the narrative of the hijacking. After half an hour, however, Yunis again complained that he was dizzy, and the session ended. By afternoon, the scopolamine patch had evidently begun to work. For the remainder of his journey on the Butte, Yunis appeared more animated and did not noticeably suffer from motion sickness. Accordingly, the interrogation sessions grew longer.

All told, Yunis answered questions during nine sessions aboard the Butte for a total of twelve hours. He not only described the full saga of the hijacking but also gave details about other events in Lebanon and the Middle East. At the end of the fourth day on the Butte, agent Hansen presented Yunis with a written confession (in Arabic), which distilled the salient details from Yunis' narrative. Yunis asked why he should sign it. As agent Hansen later testified at the suppression hearing:

> I indicated to him that by signing it, it would be a matter of record indicating exactly what he told us. And that we could not change what he had said to us and conversely he could not change what he had said to us. And again, just like anything else, he did not have to sign it, but if he cared to do so, it was up to him.

He said he would sign it, which he did. Trans. of 1/27/88 at 161. By next morning, the Butte reached the USS Saratoga, which was on maneuvers in the western Mediterranean. Yunis was transferred to that aircraft carrier and then, having been sedated for a long, confining flight, was placed within a "Stokes" litter and loaded into an S3 military plane, which flew nonstop for thirteen hours to Andrews Air Force base outside of Washington, D.C. Federal agents drove Yunis from the base to the federal courthouse in Washington, where he was arraigned before a magistrate in the late afternoon of September 17, 1987.

Yunis was given court-appointed counsel, who subsequently filed a motion to suppress the confession. The trial judge held eight days of hearings on this motion at the beginning of this year. Numerous individuals involved in "Operation Goldenrod" gave testimony, but Yunis himself did not testify. On February 23, 1988, the judge ruled that, because Yunis was

> [i]n an uncertain physical condition, in an oppressive environment and subject to relentless interrogation, [he] lacked the will necessary to voluntarily waive his rights. Further, without a comprehen-

sion of the English language or the American justice system, he certainly could not be expected to have understood the nature of his rights nor the consequences of abandoning them.

*United States v. Yunis*, 681 F.Supp. 909, 926 (D.D.C.1988). The government brought a timely appeal of this order.

## II. DISCUSSION

A. Whether Yunis Voluntarily and Knowingly Waived His Fifth Amendment Rights

### 1) *Constitutional Questions In This Case*

The parties have stipulated that Yunis, despite his alien status, can claim the protection of the fifth amendment to the American Constitution for interrogation that occurred outside the territory of the United States. Buttressing the stipulation, the FBI treated Yunis as if he enjoyed the rights guaranteed to American citizens. Since the majority of the panel are of the view that such a stipulation is acceptable and the application of the fifth amendment can be assumed arguendo, we turn to the standard of review.[*]

### 2) *The Standard of Review*

▉ Before determining whether the trial judge was correct in finding Yunis' waiver to be involuntary and unknowing, we must resolve the proper standard of review. In *United States v. Poole*, 495 F.2d 115 (D.C.Cir.1974), *cert. denied*, 422 U.S. 1048, 95 S.Ct. 2667, 45 L.Ed.2d 701 (1975), this court reviewed a federal trial judge's determination that a defendant's confession was admissible. "The ultimate determination of voluntariness and waiver, vel non," the court held, "is for this court to make, although we are rightly guided by the trial judge insofar as this must depend on matters, like demeanor, that cannot be captured in a cold record." *Id.* at 122. Thus, under clear precedent in this court, we should review *de novo* Judge Parker's de-

---

[*] Judge Mikva is of the view that this question cannot be avoided by stipulation in the posture of this case. He therefore concurs specially on this point.

termination that Yunis did not voluntarily or knowingly waive his rights.

Without adverting to our decision in *Poole,* the government asks us instead to apply a "clearly erroneous" standard to trial court findings concerning waiver. The government's justification for invoking a "clear error" standard is the Seventh Circuit's interpretation of a footnote in a recent habeas corpus decision by the Supreme Court. Nothing in the Seventh Circuit's opinion persuades us to depart from our own precedent.

In *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), the Supreme Court reaffirmed that a determination as to the voluntariness of a confession "has always had a uniquely legal dimension," *id.* at 116, 106 S.Ct. at 453, and is therefore subject to independent federal review when state court convictions are appealed (or challenged via habeas actions) in federal court. In a footnote, the *Miller* Court reserved judgment on whether state court findings as to the validity of a waiver warranted the same type of federal scrutiny. The Seventh Circuit has since concluded that the *Miller* footnote does not simply reserve this issue, but implicitly resolves it. In *Perri v. Director, Department of Corrections,* 817 F.2d 448 (7th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 135, 98 L.Ed. 2d 92 (1987), the court held that "the determination of knowing and intelligent waiver is a factual issue," reviewable only for "clear error." *Id.* at 451; *see also United States v. Wauneka,* 842 F.2d 1083, 1087 & n. 2 (9th Cir.1988) (citing *Miller* and holding that "the voluntariness of a defendant's waiver of his *Miranda* rights," although a mixed question of law and fact, is nevertheless reviewable only under a "clearly erroneous" standard).

We think the Seventh Circuit reads too much into the *Miller* footnote, which in no way advocates a reduced standard of review for waivers of constitutional rights. Even if the Seventh Circuit reads *Miller* correctly, however, this would not dispose of the case before us. The precise question in *Perri* and *Miller* was whether a state court's finding regarding the validity of a waiver is the sort of factual issue that Congress has said "shall be presumed to be correct" in federal habeas actions. *See* 28 U.S.C. § 2254(d) (1982). This need not resolve the standard of appellate review in federal criminal cases.

For these reasons, we reject the government's suggestion that we apply *Perri's* holding to the case before us. We adhere to this court's precedent in reviewing *de novo* whether Yunis waived his fifth and six amendment rights "voluntarily, knowingly, and intelligently." *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. In proceeding with a *de novo* review, we are nonetheless mindful that the trial court's subsidiary factual findings are to be upheld unless clearly erroneous. Indeed, we accept all but two of the findings relevant to the fifth amendment issue. It is primarily as a result of our *de novo* application of law to fact that we reverse the trial judge's conclusion that the fifth amendment was violated.

### 3) *Analysis of Yunis' Waiver*

#### (a) Erroneous Factual Findings

■ The district court found that "portions" of the Arabic translation of the *Miranda* warnings that FBI agents gave to Yunis "had been copied incorrectly[,] leaving out several crucial words and letters." *Yunis,* 681 F.Supp. at 924. The record does not support this finding. Indeed, no words were missing at all, and none of the words misspelled was "crucial." Rather, three minor words—one preposition, one pronoun, and one word that is equivalent to a prepositional phrase—lacked either part of a letter or, at most, a full letter. The trial judge found that, "[a]s a result, several words were either incomplete and unintelligible or took on a different meaning." *Id.* Here, too, we believe the judge greatly overstated the record.

The three instances of faulty orthography are as follows. First, the Arabic version of the word "from" was in one instance missing a circle at its beginning, which should have been part of the word's first letter. (The word appeared in this sentence: "You have the right to stop from

answering at any time.") Secondly, the Arabic for the word "what," which is normally written with a vertical line that "ma[kes] a loop to the right" at the bottom, Trans. of 1/26/88 at 127, did not contain the loop in one instance. The word, which thus lacked one of its two letters, Trans. of 1/27/88 at 41–42, appeared in the sentence "I know, I understand what I am doing." Finally, a word that means "against me" or "to me" lacked one of its three letters when it was written in this sentence: "[N]o threats or any pressure of any kind were given to me, were directed to me." Trans. of 1/26/88 at 129. As incorrectly written, the word "to me" resembled the Arabic word for "always," but only when viewed in isolation from the surrounding text. Trans. of 1/27/88 at 47.

As to all three errors, both an FBI translator and Yunis' interpreter testified that the context left no doubt as to the intended meaning. Nonetheless, the trial judge questioned the translator closely as to whether a person with less education "could read [the misspelled words] and come to a different conclusion" about their meaning. *Id.* at 55. The translator said that "possibly, yes," this could happen. The trial judge relied substantially on that statement in suppressing Yunis' confession, for he remained "unconvinced that the defendant understood the incomplete and erroneous 'Advice of Rights Form.'" *Yunis,* 681 F.Supp. at 924. We do not believe that the translator's answer to the judge's hypothetical question (or that any other part of the suppression hearing record) supports the judge's ultimate finding.

Yunis is not the sort of marginally literate person whose comprehension of the written words on the translated *Miranda* form would have been frustrated by the minor spelling errors. Yunis attended school through the ninth grade, and the evidence shows that he comprehended written Arabic without difficulty. Indeed, when he later reviewed (before signing) his written confession, Yunis noted a fairly subtle inaccuracy in the draft. Yunis made the necessary change in his own handwriting, altering the account of the hijacking so

that a particular official of the Amal militia was described as having "approved," rather than having actually "ordered," the hijacking. Yunis also noted and corrected a spelling error in the statement. Trans. of 1/26/88 at 72.

The second, and more important reason why the spelling errors were unlikely to have impaired Yunis' comprehension of the *Miranda* form is that the entire form was read to Yunis aloud, in Arabic, after he had read it to himself. This surely removed any risk of misunderstanding. Moreover, agent Hansen (as well as his interpreter) testified that he repeatedly asked Yunis, as each warning was read to him, whether Yunis understood the warning. According to both agents, Yunis consistently answered that he did understand. The district court's finding to the contrary is clearly erroneous.

■ The only other factual finding on which we disagree with the trial judge involves the injury to Yunis' wrists. The judge found that "the undisputed testimony of [three FBI agents] was that Yunis suffered and complained of throbbing and numbing pain in both wrists from th[e] moment [of his 'take down' on the yacht], continuing on throughout his confinement on the Butte." *Yunis,* 681 F.Supp. at 922. Although the record would support a finding of some persistent discomfort, there is no evidence of "throbbing and numbing pain," and indeed the record contradicts such a finding.

The most knowledgeable medical testimony as to Yunis' wrist injuries came from Dr. Rufus Gore, an orthopedic surgeon on board the Butte who was specially called upon to examine Yunis' wrists two days after the arrest. Dr. Gore later described how the injury then appeared: "with the localized focal spot, the diffuse mild swelling, there was little bruising as I recall on my notes, that did not surmise [sic] that a whole lot was going on there." Trans. of 1/20/88 at 157–58. He added that "[t]here was discomfort" but that "[i]t was not great" and that, when Yunis was not moving around, "[g]iven the nature of these

injuries as I have come to understand, him being essentially immobilized, [he] at least would certainly be very comfortable." *Id.* at 159. Dr. Gore was then pressed to elaborate:

Government counsel: So if a patient is sitting at rest, not moving his wrists, in your opinion, there should be no pain?

Dr. Gore: Very, very minimal to almost none. I can't guarantee, you know, in any specific case.

*Id.* at 160. This testimony was consistent with that of the other naval doctor, who had examined Yunis' wrists at an earlier point: "I felt that [the injury] was mild. I felt that it was causing him some discomfort and he was kind of looking at his wrists and moving them gingerly but it was not causing him any severe discomfort." Trans. of 1/20/88 at 40; *accord,* Trans. of 1/28/88 at 97–98 (testimony of agent Hansen).

The testimony of the FBI agents, to which the trial judge adverted in his suppression order, lends no more support to the finding of "throbbing and numbing pain" than does the medical testimony. The agents recounted only that Yunis complained shortly after his arrest that the handcuffs around his wrists were hurting him (at which juncture, the agents loosened the handcuffs), that he occasionally rubbed his wrists during the time he was being questioned, that Yunis seemed to wince at one point when his wrists were first handled by the doctor, and that in subsequent days he complained—when asked—that his wrists were sore.

We recognize that the trial judge's overall conclusion from this type of testimony includes an evaluation of each witness' credibility. The judge may well have felt that the witnesses depreciated (unconsciously or otherwise) the extent of Yunis' discomfort. Such assessments of credibility lie especially within the trial judge's domain, which we will not invade. *See* Fed.R.Civ.P. 52(a); 9 C. Wright & A. Miller *Federal Practice and Procedure* § 2586 (1971).

There are limits, however, to a judge's prerogative to arrive at factual findings by simply discounting the testimony before him. "[H]owever satisfied a court may be from the witness's demeanor or his demonstrated untruthfulness in other respects that certain testimony is false, it cannot use such disbelief *alone* to support a finding that the *opposite* was the fact." *Janigan v. Taylor,* 344 F.2d 781, 784 (1st Cir.) (emphasis added), *cert. denied,* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965). In the present case, none of the evidence supported the trial judge's finding that Yunis suffered continuously from "throbbing and numbing pain." Indeed, the fact that Yunis did not call the doctor's attention to his wrists until the third examination belies such a conclusion. We believe the judge's finding as to the degree of pain Yunis suffered from his fractured wrists is clearly erroneous.

(b) Applying Constitutional Standards to the Facts

Apart from its findings as to the faulty translation of the *Miranda* warnings and the pain in Yunis' wrists, the district court relied on the following factors in suppressing Yunis' confession: (1) Yunis' "nauseous and exhausted condition" from seasickness, 681 F.Supp. at 922, (2) the "hot and cramped detention room" which served as Yunis' quarters on the Butte, *id.* at 923, (3) the "detailed and exhaustive questions" that were posed to Yunis over a period of four days, *id.* at 924, (4) Yunis' alienage, which meant that he "did not grow up watching Hawaii Five-O or Matlock" and thus "was not conversant with *Miranda,*" *id.,* (5) "the absence of audio and video recordings" of the interrogation sessions, *id.* Given the totality of these circumstances, the trial judge concluded that the "defendant did not knowingly and voluntarily forego his rights when making his inculpatory oral and written statements to the FBI." *Id.* at 926.

■ We note at the outset that two of these factors are of dubious relevance to the validity of Yunis' waiver. We accept the trial judge's finding that "the necessary equipment [for taping the interrogation sessions] was immediately available at

all times," *id.* at 924, and we agree that "[v]ideotaping defendant's confession would have protected defendant's rights while at the same time providing a strong basis for ensuring the admissibility of the confession at trial." *Id.* at 925. However, there is no constitutional requirement that confessions be recorded by any particular means. At most, the failure by the FBI to use equipment at its disposal might support a larger inference that the agents' testimony did not accurately portray the circumstances surrounding Yunis' confession. The trial judge stated no such inference here. Even if such an inference is implicit in his decision, however, we reiterate our earlier point: a trial judge's ability to find facts solely by discrediting contrary testimony is limited. Based on the rest of the record in this case, we do not think the failure to tape Yunis' confession undermines the validity of Yunis' waiver.

We also find that agent Hansen's "continual interrogation," *id.* at 926, is not probative of the voluntariness or intelligence of Yunis' waiver. The record makes clear that Yunis signed the form waiving his *Miranda* rights and proceeded to discuss the hijacking with agent Hansen after the latter had talked to Yunis for only nine minutes. Thus, the agent's extensive questioning followed, rather than preceded, appellee's waiver and could not have caused that waiver or undermined its validity.

■ Despite a valid waiver, prolonged interrogation might render an eventual confession involuntary, though we do not suggest that this happened here. *See, e.g., Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (confession obtained after an hour of deceitful interrogation may not have been "voluntary," even though the validity of the defendant's prior waiver of *Miranda* rights was conceded). But the trial court ruling before us clearly held that the waiver, not the subsequent confession, was involuntary; the extent of Yunis' interrogation lends no support to that conclusion.

■ We are left, then, with Yunis' seasickness, his uncomfortably hot room on board the Butte, and his unfamiliarity with American legal culture, as the principal reasons for suppressing his confession. The question for our *de novo* review is whether the totality of these circumstances rendered Yunis' waiver of rights involuntary and unknowing. We conclude that it did not. In explaining our conclusion, we begin by reviewing the standard for knowing and voluntary waiver of *Miranda* rights.

> First, the relinquishment of the right[s] must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). In *Miranda* and its progeny, the Court has made clear that "custodial interrogations, by their very nature, generate 'compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so.'" *Moran,* 475 U.S. at 420, 106 S.Ct. at 1140 (quoting *Miranda,* 384 U.S. at 467, 86 S.Ct. at 1624). But the Court has also reminded us that "[t]he sole concern of the Fifth Amendment ... is governmental coercion," and that "[t]he voluntariness of a waiver of th[e fifth amendment] privilege has always depended on the absence of police overreaching...." *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986).

The administration of proper *Miranda* warnings, followed by a written waiver of the rights described in those warnings, will usually go far toward demonstrating that a decision to speak is not compelled. *See, e.g., North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). If the written waiver is promptly followed by an actual confession, the likelihood that the waiver was valid is often further enhanced. *Cf. Miranda,* 384 U.S. at 476, 86 S.Ct. at 1629 ("the fact of lengthy interrogation or incommunicado incarceration before a statement is made is

strong evidence that the accused did not validly waive his rights"). In addition, as the Supreme Court has recently clarified, when the government opposes a motion to suppress a confession, it "need prove waiver only by a preponderance of the evidence." *Colorado v. Connelly*, 107 S.Ct. at 523. Thus, the government must show it is more probable than not that Yunis' waiver of rights reflected "an uncoerced choice and the requisite level of comprehension." *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141. We think the government carried its burden.

Aside from the compulsion that was inherent in the circumstances of Yunis' custody and that the *Miranda* warnings are designed to mitigate, there is no evidence that Yunis was subjected to any "intimidation, coercion or deception." *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141. We note, in particular, that the trial judge found Yunis' wrist injuries to have resulted from "the forceful and aggressive arrest completed by [FBI] agents" but did not suggest that the injuries were premeditated or intentional. *Yunis*, 681 F.Supp. at 922.

Of course, this fact does not reduce the pain or discomfort that Yunis experienced. It is nonetheless relevant to assessing the voluntariness of Yunis' waiver. For example, in *Martin v. Wainwright*, 770 F.2d 918 (11th Cir.1985), *modified on other grounds*, 781 F.2d 185 (en banc), *cert. denied*, 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986), the defendant suffered a gash on his forehead when he attacked his parole supervisor and was subdued by jail guards, shortly before making his confession. In analyzing the effect of this injury on the voluntariness of defendant's confession, the court properly noted that "such force was not intended, nor could Martin possibly have believed that it was intended, to coerce him into confessing...." *Id.* at 932. The present case presents a similar situation. Because the injury to Yunis' wrists was a by-product of his arrest on the yacht, we doubt that Yunis would have perceived it as a threat—aimed at inducing his confession some two hours later, on board the Butte. In this connection, we note agent Hansen's testimony that, once Yunis was transferred to the Butte, none of the FBI agents carried weapons when in Yunis' presence. Trans. of 1/27/88 at 105. *Cf. United States v. Robinson*, 698 F.2d 448, 455 (D.C.Cir.1983) (per curiam) ("[a]ppellant can point to no threats or any use of force that might render his statement involuntary").

We similarly note that the uncomfortable temperature in Yunis' room on board the Butte does not appear to to have been intentional. Indeed, the record indicates there was some attempt to mitigate the poor ventilation. Trans. of 1/20/88 at 86. Clearly, the agents' capacity to remedy the situation was limited since the weather itself was quite warm (as one would expect in the Mediterranean in September).

As for Yunis' seasickness, we have no doubt that the recurring bouts of nausea caused Yunis some distress. The trial judge noted the doctor's remark that he would have given Yunis medication for nausea earlier had he known that Yunis would be subjected to questioning at the outset, rather than being given a chance to rest. Memorandum Order at 33. We agree that the agents would have demonstrated greater regard for Yunis' welfare had they followed either course outlined by the doctor. Nevertheless, the question before us is whether Yunis' motion sickness was so debilitating that it precluded his giving a knowing and voluntary waiver of rights. The trial judge concluded that the impairment reached this level; we disagree.

We have found no cases precisely on point—no precedents involving a nauseous defendant subjected to custodial interrogation at sea. In their briefs to this court, both Yunis and the government draw analogies between Yunis' discomfort and cases in which criminal defendants were seriously injured at the time they were questioned. In cases of *specific* injuries—such as a bullet wound in a particular area of the body—courts may be able to judge with some confidence the extent of the defendant's pain or disorientation. If the distress seems clearly severe, it is likely to have prevented the defendant from focusing on

or understanding the rights read to him—or to have undermined his will to protect his own interests. *See, e.g., Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978) (defendant complained of "unbearable" pain from abdominal gunshot wounds and his doctor described him as "depressed almost to the point of coma"; confession made from hospital bed was therefore suppressed); *cf. United States v. Martinez-Perez,* 625 F.2d 541, 543 (5th Cir.1980) (pain following surgery to remove bullet from shoulder "was not so great as to affect [defendant's] ability to give a voluntary confession").

By contrast, the physical impact of a more general medical condition—like seasickness—is harder to assess. Serious pain or disorientation is neither so likely that it can be assumed nor so unlikely that it can be disregarded. When courts evaluate physical conditions of this sort, they often look to a defendant's behavior to determine the extent of his distress. *See, e.g., Johnson v. Hall,* 605 F.2d 577, 583 (1st Cir.1979) (defendant had suffered a head wound of uncertain severity in a car crash but nevertheless "appeared to be alert ... [, and the] physical injury did not prevent him from offering physical and verbal resistance to the police at booking"); *United States v. Brown,* 535 F.2d 424, 427 (8th Cir.1976) ("[a]lthough defendant had been drinking, he was sufficiently coherent to find his driver's license, lie about the license misidentification, and climb stairs"); *see also* Annotation, *Sufficiency of Showing That Voluntariness of Confession or Admission Was Affected by Alcohol or Other Drugs,* 25 A.L.R. 4th 419, 425–26 (1983). Even when a particular injury leaves little doubt as to a confession's voluntariness, a court will often cite evidence of physical demeanor. For example, the *Mincey* Court did not simply rely on defendant's "unbearable pain" but also noted that some of his answers to police questions were incoherent. 437 U.S. at 399 n. 15, 98 S.Ct. at 2417 n. 15; *cf. United States v. Martinez-Perez,* 625 F.2d at 543 (defendant was "alert" following removal of bullet from his shoulder).

We think such an assessment of external behavior is the best way of evaluating the effect of Yunis' seasickness. And the evidence of Yunis' demeanor indicates that his seasickness did not cause severe pain or disorientation. The testimony presented to the district court was unanimous in describing Yunis as aware and alert at the time that he waived his rights. The naval doctor, for example, gave this account of his first examination of Yunis, just prior to the defendant's waiver:

> Doctor: [H]e was clearly alert. He was not—I mean, he was wide awake and alert as I am, he was somewhat—he seemed somewhat subdued. I said earlier that he looked calm. Maybe calm isn't the right word. He didn't seem overexcited or anything. He just seemed to be sitting there quietly, rather subdued, but he was definitely alert. He didn't seem to be in any discomfort....

Trans. of 1/20/88 at 30. The testimony from agent Hansen and his interpreter corroborates this description. These accounts may seem at odds with the trial judge's general observation that "defendant suffered severely from motion sickness." *Yunis,* 681 F.Supp. at 922. But we need not resolve whether the judge's finding is supported by the evidence since that finding, in any event, does not require that the confession be suppressed. The facts are clear that Yunis experienced four episodes of dry heaves or vomiting in a period of twenty hours. Whether, on this overall medical record, Yunis should be described as having "suffered severely from motion sickness" (in the trial judge's words) or as having experienced "mild nausea and lightheadedness" (in the naval doctor's words) is not dispositive of the issue before us. Rather, the critical point is whether, at the time that the *Miranda* warnings were read to him, Yunis' mental faculties were sufficiently unimpaired that he could voluntarily and knowingly waive his rights. As to this issue, the unanimous testimony that Yunis was alert and attentive during the precise period when he waived his rights is highly significant.

Other factors are consistent with this evidence of alertness. We note that, at the

time that Yunis waived his rights, at least one hour had elapsed since the only episode of nausea that he had experienced up to that point (which occurred as the transfer boat was hoisted onto the Butte). We note, as well, agent Hansen's testimony that he asked Yunis, just before explaining to him his *Miranda* rights, whether he was in pain and whether he was willing to talk and that Yunis replied (respectively) that he was not and that he would. By contrast, Yunis indicated at several subsequent points that he wished to cease talking because of his physical condition—requests that were respected. In addition, during those periods when Yunis did answer questions, he was able to furnish a detailed, chronological account of the 1985 hijacking. In sum, we conclude that Yunis' seasickness was not so severe that, when he was asked by agent Hansen whether he wished to waive his rights, Yunis' " 'will was overborne' [and] his confession was not 'the product of a rational intellect and a free will.' " *Townsend v. Sain,* 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963) (quoting, respectively, *Reck v. Pate,* 367 U.S. 433, 440, 81 S.Ct. 1541, 1546, 6 L.Ed.2d 948 (1961), and *Blackburn v. Alabama,* 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960)).

There remains, then, Yunis' alienage as a factor that may have precluded his giving a valid waiver of rights. The district court held that, "without a comprehension of . . . the American justice system, he certainly could not be expected to have understood the nature of his rights nor the consequences of abandoning them" *Yunis,* 681 F.Supp. at 926.

It is unclear what weight should be given to an alien's unfamiliarity with our legal culture in evaluating the validity of that alien's waiver. We have been cited to no precedent (nor have we found any) that addresses this issue. However, an individual's foreign background seems especially pertinent to the knowing quality of a waiver. In describing just how knowing and intelligent a waiver must be, the Supreme Court recently reiterated that a "waiver must have been made with a full awareness both of the nature of the right being

abandoned and the consequences of the decision to abandon it." *Moran v. Burbine,* 475 U.S. at 421, 106 S.Ct. at 1141.

This statement is not to be taken in an unqualified sense. "Th[e] Court has never embraced the theory that a defendant's ignorance of the *full* consequences of his decisions vitiates their voluntariness." *Oregon v. Elstad,* 470 U.S. 298, 316, 105 S.Ct. 1285, 1297, 84 L.Ed.2d 222 (1985) (emphasis added). Many defendants who confess—American citizens who, in Judge Parker's words, "grow up watching Hawaii Five-O or Matlock" and who are therefore "conversant with *Miranda* ", *Yunis,* 681 F.Supp. at 924—subsequently regret their decision and seek to recant or to exclude the evidence. In that sense, at least, such defendants are not fully aware of "the consequences of the decision to abandon" their rights at the time they confess. Yet, courts regularly admit their confessions.

As two leading commentators on criminal law thus observe:

A waiver may be knowing and intelligent in the sense that there was awareness of the right to remain silent and a decision to forego that right, but yet not knowing and intelligent in the sense that the tactical error of that decision was not perceived. But this is no barrier to an effective waiver for *Miranda* purposes, for it "is not in the sense of shrewdness that *Miranda* speaks of 'intelligent' waiver," and thus in "this context intelligence is not equated with wisdom." This is consistent with *Miranda* 's emphasis upon the need to overcome the coerciveness of in-custody interrogation.

1 W. LaFave & J. Israel, *Criminal Procedure* § 6.9, at 527 (1984) (footnote omitted) (quoting *Collins v. Brierly,* 492 F.2d 735 (3d Cir.), *cert. denied,* 419 U.S. 877, 95 S.Ct. 140, 42 L.Ed.2d 116 (1974)). Given this truth about *Miranda* doctrine, what is the precise scope of awareness that an alien defendant must evince? We conclude that, as the *Miranda* decision itself suggests, the focus must be on the plain meaning of the required warnings. A defendant must comprehend, for example, that he really does not have to speak; he must recog-

nize that anything he says actually will be used by the state against him. But whether he fully appreciates the beneficial impact on his defense that silence may have—whether he fully understands the tactical advantage, in our system of justice, of not speaking—does not affect the validity of his waiver.

In part, the reason for defining "knowing and intelligent" in this way is doubtless the one that Professors LaFave and Israel identify—namely, that *Miranda's* primary concern remains the mitigation of coercive tactics in interrogation. Indeed, the Supreme Court recently ruled that a confession was admissible notwithstanding that the defendant was insane at the time that he received *Miranda* warnings and confessed. *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1987). Obviously, such a waiver of rights could only be regarded as "knowing and intelligent" in the most restricted sense. However, the *Connelly* Court did not even consider whether defendant's waiver was "knowing and intelligent." The Court simply found the waiver to be "voluntary," reminding the state court below that "[t]he sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion." *Id.* 107 S.Ct. at 523. Because the defendant *volunteered* his confession, just after he was taken into custody and given *Miranda* warnings, the question of whether he confessed knowingly and intelligently was evidently irrelevant. Thus, a defendant's knowledge of his rights appears to be wholly subordinate to the appraisal of voluntariness.

The fact that courts define "knowing and intelligent" in this circumscribed manner does not mean that a defendant's alien status is irrelevant to the inquiry. On the contrary, courts use an "objective standard" for evaluating a defendant's waiver, and this takes into account "the education, experience and conduct of the accused." *Pettyjohn v. United States,* 419 F.2d 651, 654 n. 7 (D.C.Cir.1969), *cert. denied,* 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed.2d 676 (1970). Clearly, a defendant's alienage and unfamiliarity with the American legal system should be included among these objec-

tive factors. However, the significance of these factors will be limited to determining whether a defendant knew and understood the warnings that were read to him. The fact that a defendant's alien status may have prevented him from understanding the full, tactical significance of his decision to confess will not invalidate his waiver.

In what ways might a defendant's status as an alien affect his understanding of the rights read to him and, thus, the knowing and intelligent quality of his waiver? The facts of one federal case illustrate the interplay between foreign background and knowing waiver. In *United States v. Nakhoul,* 596 F.Supp. 1398 (D.Mass.1984), *aff'd sub nom. United States v. El–Debeib,* 802 F.2d 442 (1st Cir.1986), the defendant was informed of his *Miranda* rights in a police van, at the time of his arrest in Boston. He was later transported to a windowless holding cell, where he was interrogated in a much more aggressive fashion and during which time he was "visibly upset and wept." 596 F.Supp. at 1401. The judge found that, because defendant was a Lebanese national whose "understanding of American law, customs, and constitutional rights may be limited," he might not have realized that he could invoke the rights he received at the time of his arrest when he was subsequently questioned by different police officers in the different setting. *Id.* at 1402. Accordingly, the judge suppressed statements made in the holding cell.

Applying this same sort of analysis to the facts before us, we *conclude* that Yunis' unfamiliarity with American law did not prevent him from understanding the *Miranda* rights as they were presented to him. The record indicates that Yunis was first asked whether he could read Arabic, that he said yes, and that he was then given the translated copy of the *Miranda* warnings. After Yunis read these to himself, agent Hansen read them aloud, each line being followed by oral Arabic translations. The testimony further shows that Yunis was repeatedly asked, during this reading, whether he understood what he was being read; Yunis said he did under-

stand. Agent Hansen and his interpreter also testified that they elaborated on several concepts (such as Yunis' entitlement to a free lawyer) to make sure of his comprehension. There was also testimony that lawyers are familiar to citizens in Lebanon.

The trial judge appears to have accepted the agents' account that they explained the *Miranda* rights (and that Yunis indicated his comprehension of them), line by line. *Yunis*, 681 F.Supp. at 914. Based on this record, we cannot conclude from the fact that Yunis was Lebanese and "was not conversant with *Miranda*" that he was unable to comprehend the basic rights that were presented to him.

Our conclusion on this point is supported by precedents involving criminal defendants who are American citizens and who are uneducated or of extremely low intelligence. Courts have often held that such defendants can give knowing and voluntary waivers of their *Miranda* rights if those rights are presented to them clearly, if the evidence that they understood these rights is credible, and if—above all—there is no evidence of threats or other coercion. *See, e.g., United States v. White*, 451 F.2d 696, 700 (5th Cir.1971) (despite defendant's "below average I.Q., fifth-grade education, [and] poor reading ability," his waiver of *Miranda* rights after they were read to him was valid), *cert. denied*, 405 U.S. 998, 92 S.Ct. 1268, 31 L.Ed.2d 468 (1972); *United States v. Cox*, 509 F.2d 390 (D.C.Cir. 1974) (despite defendant's fifth-grade education, he demonstrated in court he could read and discuss the warnings); *United States ex rel. Cooper v. Warden, Illinois State Penitentiary*, 566 F.2d 28, 30 (7th Cir.1977) (defendant, though having a low I.Q., "could 'read and understand' his *Miranda* rights if he were helped and 'if he took the time,'" and therefore he gave a valid waiver); *United States v. Nash*, 414 F.Supp. 1213, 1218 (S.D.Tex.1976) (defendant, who had an I.Q. of 78 and the vocabulary of a fourth grader but was able to read the rights form slowly, did give a valid waiver since "no promises, threats or physical force was used to persuade him").

Because the district court relied upon a number of factors in concluding that Yunis' waiver was involuntary, we have necessarily examined each of them in turn. Like the trial judge, however, we recognize that the ultimate determination that a waiver is knowing and voluntary must rest on the totality of the circumstances. *See Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979). We do not suggest that the whole of Yunis' circumstances was anything less than the sum of the parts, though we find many of those parts less serious (in terms of undermining a knowing and voluntary waiver) than did the district court. We acknowledge, for example, that the injuries to Yunis' wrists—though not by themselves causing "numbing and throbbing pain"—may have augmented the discomfort or anxiety that Yunis otherwise experienced from the seasickness, the overheated room and his unfamiliarity with the American legal system. In short, we have not lost sight of these factors' collective effect. We nevertheless conclude, from the totality of the circumstances, that Yunis' waiver was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception [and was] ... made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141. Accordingly, we find no violation of the fifth amendment that warrants suppressing Yunis' confession.

B. Whether Yunis Voluntarily and Knowingly Waived His Sixth Amendment Rights

The district court held that Yunis' sixth amendment right to counsel had attached as of the time of his arrest, because the "government had long since committed itself to prosecute Yunis." *Yunis*, 681 F.Supp. at 928. The trial judge thus invoked the general principle laid down in such cases as *United States v. Gouveia*, 467 U.S. 180, 187, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146 (1984), as to when a defendant's right to counsel begins. In the dis-

trict court and again on appeal, the government has vigorously contended that Yunis' right to counsel was triggered only by the indictment that was filed against him in Washington on September 15, 1987—roughly mid-way through Yunis' journey aboard the Butte. Since we find that Yunis waived his sixth amendment right, we need not resolve whether that right attached on September 15th or earlier. For the same reason, we also do not examine whether Yunis' entitlement to sixth amendment rights at trial permits him to exclude his confession by arguing that these rights were previously violated during his interrogation at sea.

The trial judge found that Yunis' agreement to answer questions without counsel (following his receipt of the *Miranda* warnings) was not a valid waiver of his sixth amendment rights, because the judge had already found the waiver ineffective as to Yunis' fifth amendment rights. The same principle of symmetry leads us to the opposite conclusion. There can be no doubt that the warnings administered to Yunis effectively advised him of his rights under both amendments. Agent Hansen testified that he made a particular effort to explain to Yunis the role of lawyers in the American justice system and Yunis' entitlement to one free of charge. Because we have already found that Yunis' waiver, following the *Miranda* warnings, was effective with respect to his fifth amendment rights, we find it was similarly effective with respect to his right to counsel. As the Supreme Court recently held in *Patterson v. Illinois*, —— U.S. ——, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988), the standard for knowing and voluntary waiver of rights under these two amendments is the same. Therefore, we find no sixth amendment ground for suppressing Yunis' confession.

C.  Whether Yunis' Confession is Inadmissible Because of Unreasonable Delay Between Arrest and Arraignment

The district court also suppressed Yunis' confession for the independent reason that Yunis' journey across the Mediterranean on board the Butte was not a "reasonable delay" within the meaning of 18 U.S.C. § 3501(c) (1982). The operation of this statute deserves brief discussion.

Under the so-called *McNabb–Mallory* rule, the Supreme Court has required suppression of confessions obtained after "unnecessary delay" between arrest and arraignment. *See, e.g., McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) (relying in part on Fed.R.Crim.P. 5(a), which requires the presentment of arrestees before a magistrate without "unnecessary delay"). In applying the *McNabb–Mallory* rule in earlier years, courts sometimes suppressed confessions obtained fairly soon following arrest, on the ground that an unnecessary delay in arraignment had nonetheless occurred. Congress intervened to blunt this effect of the *McNabb–Mallory* rule, enacting section 3501 of the criminal code in 1968.

Section 3501(c) carves out two exceptions to *McNabb–Mallory*. First, it provides that no confession will be excluded at trial solely on the grounds of "unnecessary delay," if it was obtained within the first six hours after arrest. Secondly, the statute extends this grace period if "the delay in bringing [the defendant] before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate or other officer." 18 U.S.C. § 3501(c) (1982). It is this last requirement that the trial judge found had not been met in Yunis' case: he found the delay after the first six hours was not "reasonable" within the meaning of the statute.

The district court evidently concluded that if the delay is not reasonable under section 3501(c) (and thus presumably "unnecessary" under Fed.R.Crim.P. 5(a)), the *McNabb–Mallory* rule requires that the defendant's confession be suppressed. Because we find that the delay in this case was reasonable, we need not pass upon the consequences of unreasonable delay. *See United States v. Robinson*, 439 F.2d 553, 563–64 (D.C.Cir.1970) (section 3501(c) modi-

fies but does not eliminate the court's authority to suppress confessions under *McNabb–Mallory* because of delay in arraignment); Comment, *18 U.S.C. § 3501 and the Admissibility of Confessions Obtained During Unnecessary Prearraignment Delay*, 84 Mich.L.Rev. 1731, 1748–54 (1985) (same). *But cf. United States v. Halbert*, 436 F.2d 1226, 1231 (9th Cir.1970) (the "prime purpose" of section 3501 was "to remove delay alone as a cause for [suppression] ... and to make the voluntary character of the confession [ ] the real test"); 1 C. Wright, *Federal Practice and Procedure* § 73, at 93 (1972) (same).

■ The precise basis for the trial judge's conclusion that Yunis' journey to the United States was not a "reasonable" delay is unclear. On the one hand, the judge implied that the government had chosen a slow mode of transportation in lieu of a faster one, thus "purposely creat[ing] the delay between arrest and arraignment" and "deliberately schedul[ing] a four-day voyage across the Mediterranean to allow the FBI sufficient time to interview and secure a statement from Yunis." 681 F.Supp. at 927. At other points in the same opinion, however, the judge suggested only that the government failed to make Yunis' journey on board the Butte as short as it could have been. *Id.* To the extent the trial judge relied on the first rationale, we believe his finding is clearly erroneous. To the extent the judge found that the trip via the Butte could have been made in less time, we accept the factual determination but disagree that the extra time in transit was not a "reasonable" delay within the meaning of section 3501(c).

### 1) *Modes of Transportation*

The district court's finding that the government "purposely created the delay between arrest and arraignment" is not supported, even by the facts found in its own decision. At most, the record shows (1) that the FBI claimed that it instructed the Department of Defense (which was in charge of transportation logistics) to convey Yunis to the United States as soon as possible but that it did not impose a deadline upon the Defense Department; (2)

that, once the Department of Defense had determined which forms of transport it would use, the FBI accepted the four-day time period that the journey on board the Butte required; and (3) that the FBI planned to interrogate Yunis during this journey.

The district court's Memorandum Order suggests that the trial judge discounted the FBI's claim that it instructed the Defense Department to choose the fastest possible method of returning Yunis to the United States. Even if that testimony is discredited, however, the record does not add up to a finding that the government purposely chose a slow mode of transportation over a faster one. Indeed, the trial judge did not point to any available mode of transportation that the government rejected. He simply found the record "barren of suggestions that alternative means of transportation were ever seriously considered." 681 F.Supp. at 927.

In the most literal sense, this may be true, but the government effectively demonstrated that alternatives were never "seriously considered" only because their defects were readily apparent. For example, agent Hansen testified that the Defense Department did not have any sea planes that could have transported Yunis by air from the site of his arrest to the USS Saratoga. Trans. of 1/28/88 at 25. And the option of hiring a commercial sea plane was ruled out because no American companies had planes in the region, and, in any event, the inclusion of civilians within Operation Goldenrod posed security and other risks. *Id.* at 26, 92. In addition, the government rejected the option of flying Yunis to the United States from a Mediterranean country, on the grounds that this could create extradition problems. *Id.* at 93–97. Finally, postponing Yunis' arrest for two or three weeks (to a time when the USS Saratoga would have been in the eastern Mediterranean) was not feasible because the FBI's informant believed there was only a "narrow window of opportunity"—in mid-September—for successfully implementing the arrest plan. *Id.* at 185–87.

Given this record, the trial judge's conclusion that the government "purposely" delayed Yunis' transit to the United States by not utilizing a faster mode of transport is not supported by the evidence. Nor can it be said that the government failed to consider transportation alternatives.

### 2) *The Butte's Capacity For Greater Speed*

The district court's finding that section 3501 was violated also rested on the fact that the Butte might have reached the USS Saratoga earlier had it traveled at a faster speed than the one planned. According to testimony from the Butte's quartermaster, the original plan called for an average speed of fifteen knots whereas the ship's maximum speed (and the one it ended up using, because of an emergency detour) was twenty knots. Trans. of 1/25/88 at 146. Had the ship adhered to the higher speed as well as the original route, it might have made its rendezvous with the Saratoga (and thus Yunis might have been brought before a magistrate in the United States) roughly thirteen hours earlier. *Id.* at 167. We hold that these "extra" thirteen hours did not render the delay between arrest and arraignment unreasonable "considering the means of transportation and the distance to be traveled." 18 U.S.C. § 3501(c).

There is no evidence that the Butte's scheduled speed was any less than its normal one, or that the detour that it took (at maximum speed) was for a dilatory purpose, or that the government gained a significant advantage during the extra thirteen hours. In this regard, it should be noted that a principal concern of the *McNabb–Mallory* rule is absent from Yunis' case. In the majority of criminal cases, police have no warrant for the arrest. An arraignment is thus essential "so that the issue of probable cause may be promptly determined" by a neutral magistrate. *United States v. Mallory,* 354 U.S. at 454, 77 S.Ct. at 1359. In the present case, a magistrate issued a warrant prior to Yunis' arrest. Appellee's brief at 32. Thus, there is no possibility that the government pursued an "investigatory arrest," delaying the arraignment so that it could obtain a confession that would then supply the probable cause. *See Baker v. McCollan,* 443 U.S. 137, 143, 99 S.Ct. 2689, 2694, 61 L.Ed.2d 433 (1979) (second determination of probable cause for detention pending trial is not constitutionally required). This does not mean, of course, that prompt arraignment is not still desirable. We conclude, however, that Yunis' journey to the United States was "reasonable" notwithstanding that the Butte might have shaved thirteen hours off of its travel time had it proceeded at top speed on a more direct course.

### III. Conclusion

The interrogation of Yunis hardly qualifies as a model for law enforcement behavior. But the Constitution does not require picture-perfect routines. Rather, the strictures of the fifth amendment are intended to ensure that " 'the accused was not involuntarily impelled to make a statement, when but for the improper influences he would have remained silent.' " *Miranda v. Arizona,* 384 U.S. at 462, 86 S.Ct. at 1621 (quoting *Bram v. United States,* 168 U.S. 532, 549, 18 S.Ct. 183, 189, 42 L.Ed. 568 (1897)).

Yunis' physical circumstances at the time that he waived his *Miranda* rights may well have been uncomfortable, and his sudden arrest no doubt took him by surprise. The FBI agents might well have used less force in arresting Yunis (so as not to have fractured his wrists); they could also have been more solicitous of Yunis' welfare following arrest (for example, by giving him medication against nausea right away). But discomfort and surprise, by themselves, have never sufficed to render a waiver unknowing and involuntary—*provided* that police administer proper warnings and do not engage in "intimidation, coercion or deception." The evidence shows that these prerequisites for a valid waiver were met. Indeed, Yunis not only said that he understood the warnings and agreed to waive the rights contained therein but proceeded to recount his participation in the hijacking without any hesitation. Assessing the totality of the cir-

cumstances, we cannot conclude that Yunis' waiver was invalid. Therefore, the trial court's order suppressing the use of Yunis' confession as evidence at trial is

REVERSED.

MIKVA, Circuit Judge, concurring specially:

I confront at the outset an issue that the parties wish to avoid by stipulation: whether, as an alien, Yunis can challenge interrogation outside the territory of the United States on the grounds that the questioning violated the American Constitution. As has been noted, the FBI treated Yunis from the moment of his arrest *as if* he enjoyed the rights guaranteed to American citizens; Yunis understandably accepts that premise. This court, however, is not so free to enter into constitutional hypotheticals. It is well established that a court should not adjudicate constitutional issues unless they are essential to resolving the case. *See, e.g., Harmon v. Brucker,* 355 U.S. 579, 581, 78 S.Ct. 433, 434, 2 L.Ed.2d 503 (1958) (per curiam). If fifth amendment rights do not extend to aliens who are interrogated on the high seas, this court need not determine whether Yunis gave a valid waiver of those rights.

As the trial judge noted, the Supreme Court has never determined whether aliens are entitled to the protections of our Bill of Rights outside the United States. *See* L. Henkin, *Foreign Affairs and the Constitution* 500–01 n. 69 (1972). The law in this court is also unsettled on the point. *See, e.g., Sanchez–Espinoza v. Reagan,* 770 F.2d 202, 208 (D.C.Cir.1985) (declining to "reach the question whether the protections of the Constitution extend to noncitizens abroad"). The trial judge nevertheless concluded that the fifth amendment did apply to the government's interrogation of Yunis on board the Butte. In reaching this conclusion, the judge asserted that a "majority of circuits" have "required the United States government to conform to constitutional proscriptions when acting overseas." *Yunis,* 681 F.Supp. at 917 (footnote omitted). Indeed, the judge cited Supreme Court language to the effect that the Constitution restrains the federal government " 'whenever and wherever the

sovereign power of that government is exerted.' " *Id.* (quoting *Balzac v. Porto Rico,* 258 U.S. 298, 312, 42 S.Ct. 343, 348, 66 L.Ed. 627 (1922)); *see also United States v. Verdugo–Urquidez,* 856 F.2d 1214 (9th Cir.1988) (fourth amendment applies to search of nonresident alien's home abroad).

We need not decide whether the trial judge is right as to the constitutional strictures imposed on our government when it acts against aliens outside the territory of the United States. My analysis of the constitutional issue is somewhat different from the district court's, but I reach the same conclusion: Yunis' confession must be suppressed if it was obtained in violation of the fifth amendment.

At least since the landmark decision in *Miranda v. Arizona,* 384 U.S. 456, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), courts have protected the right against self-incrimination primarily by circumscribing police interrogation. It bears reemphasizing, however, that the fifth amendment's text does not refer to custodial interrogation. Rather, it focuses on the period of trial and prosecution, proclaiming that "[n]o person ... shall be compelled in any criminal case to be a witness against himself."

The Supreme Court has explained its extension of the self-incrimination clause to cover testimony given in situations not literally encompassed by the amendment's text in this fashion:

[A] defendant's right not to be compelled to testify against himself at his own trial might be practically nullified if the prosecution could previously have required him to give evidence against himself before a grand jury....

In more recent years this concern—that compelled disclosures might be used against a person at a later criminal trial —has been extended to cases involving police interrogation.

*Michigan v. Tucker,* 417 U.S. 433, 440–41, 94 S.Ct. 2357, 2362, 41 L.Ed.2d 182 (1974). As this statement makes clear, the focus of the fifth amendment protection continues to be the *use* of compelled, self-incriminatory evidence against the defendant at trial.

This fact was made clear in one of the Supreme Court's earliest decisions enforcing the self-incrimination clause. In *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), the Court excluded a confession from an American trial, notwithstanding that the coercive interrogation was conducted by a foreign police officer in a foreign country. As the Ninth Circuit subsequently explained this result,

> [i]t is not until the statement is received in evidence that the violation of the Fifth Amendment becomes complete. For this reason we believe that if the statement is not voluntarily given, whether given to a United States or foreign officer—the defendant has been compelled to be a witness against himself when the statement is admitted.

*Brulay v. United States*, 383 F.2d 345, 349 n. 5 (9th Cir.), *cert. denied*, 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478 (1967); *cf. United States v. Wolf*, 813 F.2d 970, 972 n. 3 (9th Cir.1987) (fifth amendment may not require exclusion when confession is obtained abroad by foreign police, without involvement of American officials). I conclude, then, that the circumstances surrounding Yunis' interrogation by FBI agents aboard the Butte should be subjected to fifth amendment scrutiny.

My conclusion is reinforced by precedents involving compelled testimony under grants of immunity. For example, in *New Jersey v. Portash*, 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979), a criminal defendant had declined to testify in his own behalf because the trial judge had ruled that defendant's prior grand jury testimony (given under a grant of immunity) could be used to impeach him on the witness stand. In overturning the defendant's conviction, the Court noted that "[t]estimony given in response to a grant of legislative immunity is the essence of coerced testimony," *id.* at 459, 99 S.Ct. at 1297, since the immunity wipes away any legal right of the witness to refuse to testify. Accordingly, the prior testimony could not even be used to impeach, because "a defendant's compelled statements ... may not be put to any testimonial use whatever against him in a criminal trial." *Id.*

I think a strong analogy can be drawn between cases like *Portash* and the case *sub judice*. If it is true that an alien who is interrogated outside the territorial United States cannot at that point claim fifth amendment rights, then he is in much the same position as a grand jury witness who has been granted immunity and therefore has no fifth amendment ground for refusing to testify. However, both persons—if *compelled* to give self-incriminating statements by an agent or institution of our government—must have the right to exclude those statements from any subsequent proceeding against them in American court. Nor can there be any doubt that, once Yunis is in an American courtroom, he is protected by the privilege against self-incrimination despite his alien status. *See Wong Wing v. United States*, 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896) ("it must be concluded that all persons within the territory of the United States are entitled to the protection guaranteed by th[e fifth and sixth] amendments").

I conclude that Yunis' confession is subject to fifth amendment scrutiny and therefore our review of the trial judge's ground for suppressing the confession is mandatory. I do not agree with my colleagues that the mere stipulation of the parties allows us to avoid the uncomfortable but necessary constitutional analysis.